Steven Shiffman (SS-3630)
KATTEN MUCHIN ZAVIS ROSENMAN
575 Madison Avenue
New York, New York 10022
(212) 940-8800
Attorneys for Plaintiff Michael Trent Reznor

Zia F. Modabber (pending admission *pro hac vice*)
KATTEN MUCHIN ZAVIS ROSENMAN
2029 Century Park East, Suite 2600
Los Angeles, California 90067
(310) 788-4400
Attorneys for Plaintiff Michael Trent Reznor

JUDGE RAKOFF

04 CV 3808

MAY 19 2004
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL TRENT REZNOR, an individual,<br>Plaintiff,<br>-against-<br>J. ARTIST MANAGEMENT, INC., an Ohio Corporation, JOHN A. MALM, JR., an individual, RICHARD SZEKELYI, an individual, and NAVIGENT GROUP,<br>Defendants. | Case No.<br>COMPLAINT<br>JURY TRIAL DEMANDED |

Plaintiff Michael Trent Reznor ("Reznor"), by his attorneys, Katten Muchin Zavis Rosenman, for his complaint (the "Complaint") against defendants alleges as follows:

## NATURE OF THE ACTION

1. This case arises from the knowing, pervasive exploitation by professional advisors of an immensely gifted and trusting artist. Plaintiff Trent Reznor is one of the millions of aspiring musicians fortunate enough to have the talent and dedication to make him both a critically acclaimed and highly popular artist. Since 1989, Reznor has performed as "Nine Inch

Nails," ("NIN") and he is the musician, songwriter and vocalist singularly responsible for virtually every NIN song and recording. NIN has sold millions of albums and performed to millions of fans around the world.

2. In the mid 1980's, Reznor hired John A. Malm, Jr. ("Malm") as his personal manager. Malm provided his management services through his company, J. Artist Management, Inc. (Malm and his company will be referred to interchangeably as "JAM") At JAM's urging, and after being convinced it was the way to run his affairs as detailed below, Reznor put complete trust and power over his business affairs and personal finances in JAM. In return, as NIN's financial success and popularity increased, so too did JAM's ego and greed. The result was an insatiable willingness to take advantage of, deceive and exploit Reznor, combined with the ability to do so through self-arranged, complete control over all legal documents, bank accounts and money.

3. This lawsuit seeks to undo years of abuse of the fiduciary duty JAM owed to Reznor; undo the numerous unconscionable contractual arrangements and unwind the numerous companies JAM created through fraud and breaches of fiduciary duties; confirm rightful ownership of intellectual and tangible property in Reznor; compensate Reznor for the millions of dollars wrongfully taken from him by JAM; and compel the return of the most basic financial and legal documents and other property belonging to Reznor but wrongfully withheld.

4. This lawsuit also seeks to hold Richard Szekelyi and Navigent Group (who are referred to interchangeably as "Szekelyi") liable for Szekelyi's conspiracy with, and knowing assistance to, JAM in JAM's misdeeds. At the time of Szekelyi's actions as described herein, Szekelyi was the business manager and accountant for JAM, Reznor and all of the jointly-owned companies owned or controlled by both of them – a role rife with inherent conflicts of interests. Armed with control over all books, records bank accounts and money, Szekelyi handled significant business transactions <u>between</u> his concurrent clients without full disclosure or informed consent – a plain conflict of interests. These transactions were to the substantial

detriment of one of his clients, Reznor, and in substantial favor of his other(s), JAM and his companies.

5. In further breach of their legal, professional and ethical obligations, Szekelyi and JAM provided highly misleading financial information to Reznor in an effort to conceal their misconduct, and now refuse to return all the books and records in their possession – Reznor's rightful property – so that Reznor can determine the full extent of his damages.

## THE PARTIES

6. Reznor currently lives in Los Angeles, California and is temporarily working in New Orleans, Louisiana.

7. Reznor is informed and believes, and on that basis alleges that J. Artist Management, Inc. is an Ohio corporation maintaining offices and doing business in New York, New York and Cleveland, Ohio.

8. Reznor is informed and believes, and on that basis alleges that defendant John A. Malm, Jr. is an individual residing at times in Lakewood, Ohio, and at other times in New York, New York, and at all relevant times doing business in New York and Ohio. On information and belief, Malm is the sole owner of J. Artist Management, Inc. and does business as, and through, that entity.

9. Reznor is informed and believes, and on that basis alleges that Richard Szekelyi is an individual residing in Cleveland, Ohio and at all relevant times doing business there and in New York, New York. At all relevant times, Szekelyi was the business manager and accountant for Reznor, Malm, J. Artist Management, Inc. and all entities described herein that were owned or controlled by Reznor and JAM.

10. Reznor is informed and believes that Navigent Group is an Ohio company of unknown form, doing business in Ohio and New York, New York. Reznor is further informed and believes that Szekelyi is a principal of Navigent Group.

11. Reznor is informed and believes, and on that basis alleges, that beginning in or around 1996 JAM and Szekelyi conspired with one another in all of the self-dealing transactions detailed below. As a result, and in addition to his liability for his own misconduct alleged herein, Szekelyi is liable as a co-conspirator for all damages flowing from his conspiratorial conduct.

**JURISDICTION AND VENUE**

12. This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that there is complete diversity between plaintiff Reznor and defendants John A. Malm, Jr., J. Artist Management, Inc., Navigent Group and Richard Szekelyi (collectively "Defendants") on each of the claims asserted by Reznor against Defendants. The amount of Reznor's claims against each of the Defendants exceeds $75,000.

13. This Court has personal jurisdiction over Defendants in that the acts complained of herein occurred in the Southern District of New York. Specifically, J. Artist Management, Inc. and John A. Malm, Jr. maintained corporate offices in New York and all Defendants provided management and business management/accounting services within New York. JAM's offices in New York were used to handle all matters relating to Reznor and his companies, and Navigent and Szekelyi provided their services to all of the clients identified above at, through or with these offices.

14. Venue is proper in this district under 28 U.S.C. §§ 1391(a)(2) and by virtue of the fact that Reznor and JAM contracted to have all disputes heard in the State of New York. Paragraph 16(d) of the Management Agreement provides:

> This Agreement has been entered into in the State of New York, and the validity, interpretation and legal effect of this Agreement shall be governed by the laws of the State of New York applicable to contracts entered into and performed entirely within the State of New York. The New York courts, only, will have jurisdiction of any controversies regarding this Agreement; and, any action or other proceeding which involves such a controversy will be brought in the courts of the State of New York, and not elsewhere.

## THE WRITTEN MANAGEMENT AGREEMENT

15. In approximately 1985, Reznor was working trying to break into the music business as a songwriter, recording artist and singer. He met Malm who was already involved in the business promoting concerts and managing local acts. The two began working together and Reznor hired Malm as his manager in approximately 1986. Like all artists, Reznor hired Malm to handle and direct his business interests while he pursued his creative interests. From the beginning of their manager/artist relationship, Malm encouraged Reznor to focus on the creative side of his career and entrust all of the business aspects of his career to Malm. Based on the trust he was legally entitled to repose in his closest fiduciary, Reznor directed his efforts on his artistic craft, and relied on his (over) compensated manager to perform his functions in handling his business affairs.

16. As a result of this relationship, and from the beginning of their working together, Reznor was encouraged to, and did, believe that JAM had his best interest at heart and would never take advantage of Reznor in any fashion. As a fiduciary, JAM owed Reznor the highest duty of openness, honesty, loyalty and disclosure. He was never permitted to put his own interests above Reznor's and was required to disclose all material facts and information known to him in any way related to the services he was providing to Reznor, even if those facts placed him in a poor light or might jeopardize his continuing relationship with Reznor. Reznor was legally entitled to and did place the highest level of trust in JAM for over 15 years.

17. In early 1989, TVT Records recognized Reznor's talent and signed him to recording and publishing contracts. Malm handled the negotiations on Reznor's behalf. At Malm's direction, New York attorney Michael Toorock provided certain legal services related to the recording and publishing contracts.

18. Later, in approximately April 1989, and unbeknownst to Reznor, Malm requested that Toorock prepare a draft written management agreement between him and Reznor, and dictated the material business terms he wanted included. Reznor is informed and believes that

Toorock prepared a draft agreement by using, as a form, a document he had prepared for another personal manager client, changing the names of the parties and incorporating the business points specified by Malm.

19. The imposing legal document is no less than ten pages of single spaced legalese. The term of the agreement runs for five years, and some of its terms include that:

(A) JAM had the right to direct, in Reznor's name, and without limitation, all Reznor's other professionals, specifically including his lawyers and accountants.

(B) JAM is entitled to 20% of all gross monies paid to or earned by Reznor, without any of the customary deductions for recording, "sound and lights" and other costs and expenses necessarily incurred in the creation of commissionable products or activities.

(C) JAM is entitled to its 20% commission forever, even if JAM is no longer the manager and is providing no services.

(D) If Reznor entered into a contract for multiple numbers of albums, JAM is entitled to its 20% on all albums, including those that may not be recorded for years after the agreement expires and JAM has ceased to provide any services. Like the albums created during the term of the agreement, commissions on these "post-term" albums run forever.

(E) JAM has the "irrevocable" right to collect income payable to Reznor, endorse Reznor's name, cash any and all checks payable to Reznor, and pay itself using such monies.

(F) JAM and Reznor must agree on the selection of Reznor's accountant, and Reznor cannot replace his own accountant unless JAM approves Reznor's right to do so.

(G) If at any time Reznor fails "for any reason whatsoever" to fulfill any obligation under the Agreement, JAM has the right to unilaterally extend the expiration date of the Management Agreement.

20. While owing his artist the highest fiduciary duty of loyalty and honesty, even with respect to JAM's own compensation, JAM avoided any further involvement by Toorock in the Management Agreement and took the draft contract prepared at JAM's direction directly to Reznor requesting that he sign it. JAM presented the complex, highly favorable (to JAM) legal document to Reznor all but stating that there was nothing important enough in the document to merit discussion. JAM provided no explanation of any of the material terms of the agreement. He told Reznor that it was prepared by his lawyer, Toorock, that it was a mere formality, that the one-sided agreement was completely fair, and that he should sign it. JAM assured Reznor that Reznor should trust him, and that he would never take advantage of him. Trusting JAM completely, he signed. JAM knew Reznor did so without ever having the terms explained, without knowing the purpose and effect of the terms and without the advice of any independent advisor or counsel. In obtaining Reznor's signature, JAM scrupulously avoided Toorock's involvement in the process such that Toorock did not know the agreement had been signed until years later. Moreover, despite requests over the years, no attorney for Reznor received a signed copy of the agreement until late 2003, with JAM demurring at various times claiming that he was not sure he had a signed agreement in his possession.

21. A true copy of the 1989 Management Agreement ("Management Agreement") is attached hereto as Exhibit "A."

## REZNOR'S "NINE INCH NAILS" NAME AND LOGO

22. Reznor originated the name Nine Inch Nails ("NIN"). He and a friend designed the logo with the express understanding and agreement that Reznor owned it. JAM had no involvement whatsoever in the development of the logo. In 1989, NIN released an EP entitled "Down In It" followed by NIN's first album entitled "Pretty Hate Machine." Both used Reznor's

NIN name and logo. Reznor has used the name and logo in conjunction with his personal services and merchandise in commerce continually since that time, and has been singularly associated with all music and products bearing the NIN name and mark. The name and logo have never been used in conjunction with any goods or services relating to JAM. Nevertheless, as described below, JAM has attempted to take for himself this and other of Reznor's valuable intellectual property rights.

## THE DEVELOPMENT OF CONTROL

23. After the release of "Pretty Hate Machine," NIN toured for nearly two years. During this period JAM began to exercise control over all Reznor's affairs. He handled all money and bank accounts, formed and controlled a series of jointly-owned companies using professionals selected and directed by JAM and insulated Reznor from contact with any of his outside attorneys, business managers or accountants. He told Reznor he would take care of those affairs. Throughout this period, Reznor came to rely solely on JAM, his closest fiduciary and confidant, for almost all aspects of his professional life and personal finances. Over the next 10 years, JAM welcomed and encouraged his client's isolation from all other advisors, whom JAM was free to direct and control.

24. In or around 1992, Interscope Records signed Reznor to a recording contract, calling for the production and release of up to seven albums. Shortly thereafter, and based on Reznor's talent and ability to attract and work with other artists, Interscope offered to fund the creation of a record label for Reznor – which was not uncommon for record companies at the time for their premier artists. Interscope believed that because of Reznor's talent and success, he could attract and develop other artists, and Interscope would share in the profits. Hearing of the label opportunity, JAM proposed that he would manage the day-to-day affairs of the label in exchange for half the company, while Reznor would attract, produce and promote label artists. JAM unilaterally selected and directed attorneys to form Nothing Records, Inc. ("NRI"), the

entity through which the new label conducted its activities. JAM became a one-half owner of NRI and was authorized to act on its behalf virtually without limitation.

25. In this self-dealing transaction between JAM and Reznor, Reznor had no counsel and was not represented in any capacity. There were no arms-length negotiations between JAM and Reznor for the creation, operation or control of the joint entity, and at JAM's urging Reznor put his entire trust in JAM to handle the business undertaken by NRI.

26. Remarkably, under JAM's oversight, Reznor's recording agreement for NIN recordings was put into the 50% JAM-owned NRI. Apart from improperly placing ownership of Reznor's personal and lucrative recording agreement in the jointly-owned NRI, this created a situation where Reznor's rights under his recording agreement became subject to the claims of the creditors of NRI, the label. At various times JAM has maintained that this was done by mistake, but that the NIN recording contract could not be removed from the NRI entity without causing substantial adverse tax consequences to Reznor. Reznor seeks to hold JAM liable for any and all adverse tax consequences incurred as a result of the proper removal of the NIN recording agreement from NRI.

**<u>REZNOR'S TRADEMARKS</u>**

27. Up until 1994, there were no trademark registrations for the name "Nine Inch Nails" or the NIN logo. In approximately 1993, JAM asked Reznor to sign unspecified forms relating to the trade name "Nine Inch Nails" and mark "NI[backward]N". JAM deliberately concealed that the documents he presented were actually trademark registration forms that purported to vest ownership of Reznor's valuable intellectual property rights in JAM and Reznor jointly. True to form, JAM had no lawyer or other representative review the document on Reznor's behalf. JAM now claims that his unconscionable and fraudulent obtaining of Reznor's signature entitles him to a one-half ownership interest in the NIN name and logo.

28. Reznor never agreed to give JAM any interest in any of the intellectual property he created as or for NIN. This particularly despicable act is one of the highlights of JAM's systematic abuse of Reznor in furtherance of JAM's greed and self-interest.

**THE MERCHANDISING SCHEME**

29. Beginning no later than 1993, JAM further took advantage of his client's valuable intellectual property rights. JAM suggested to Reznor yet another self-dealing transaction in which, instead of Reznor entering into a third party merchandising agreement to manufacture and sell NIN products, JAM and Reznor would form another jointly-owned company and split the profits. To induce Reznor to agree, JAM told Reznor that Reznor would get paid his proper share of money for the sale of NIN merchandise, and that JAM would receive his 20% management commission on that money. He also proposed that in exchange for running the day-to-day operations of the company, he would be entitled to 50% of the merchandising company's profits (as opposed to Reznor's royalties). Reznor, for his part, would attract artists to sign merchandising deals with their company. Relying on JAM's promises and advice, Reznor agreed, assuming once again that he would be treated fairly and not taken advantage of by his manager. Here too, Reznor's reliance on JAM was horribly misplaced, resulting in over $1 million dollars of damage.

30. In the typical merchandising arrangement, an artist will license his name, image, likeness and any trade name or marks to a merchandising company, which will in turn manufacture and sell t-shirts, hats and other items at concerts, retail outlets and elsewhere. In return for the license, the artist is paid a royalty and advances against such royalties. A manager may commission these royalties. For popular touring artists, these royalties and advances can be worth millions for a single tour.

31. Yet again, JAM hired the lawyers to form the JAM/Reznor merchandising company called J. Artist Management Merchandise, Inc. dba "Object." Reznor received no independent advice or counsel in relation to the formation or control of Object, or his rights over

his name, trademark, image or likeness. JAM, and later Szekelyi, handled all the finances and maintained all the books and records for Object. Unbeknownst to Reznor until late 2003, instead of paying Reznor his proper arms-length royalty for NIN merchandise, the jointly-owned company controlled by JAM and Szekelyi in fact paid Reznor no royalty. Instead, all monies made from the sale of NIN merchandise went to the jointly-owned company and were then split, giving JAM 50% of Reznor's NIN merchandising royalties. Through this deceit, instead of JAM and Reznor sharing only the profit, if any, that would have been made by the merchandising company after paying a market rate royalty for artist licenses, JAM received 50% of all monies derived from the sale of all NIN merchandise – taking a royalty-free license from Reznor. Not satisfied with half of Reznor's money, in certain instances JAM then charged a 20% commission on Reznor's 50% of merchandise sales. Reznor is informed and believes that through this scheme JAM pocketed over $1 million of Reznor's royalties at a bare minimum.

32. Over the next 10 years, JAM assured Reznor his arrangement was fair and that he was being paid properly. During a meeting in August 2003, Reznor specifically asked JAM and Szekelyi about the propriety of this company and merchandising arrangement, and was expressly assured that the arrangement was as good or better than any other arrangement he could have made with a traditional third-party merchandising company.

## MORE SELF-DEALING

33. During the course of JAM's abuse of Reznor, and while purporting to act in his capacity as Reznor's personal manager, JAM formed several other companies. He did so after inducing Reznor to give him half, and then caused those companies to enter into deals with Reznor without any independent scrutiny or control. In none of these transactions did Reznor have counsel, and JAM and Szekelyi have controlled all these companies' books and records. The companies include, among others, Nothing Records Limited, Inc., ("NRLI"), Hot Snakes, LLC ("Hot Snakes") and Nothing Interactive, Inc. ("NI"). Given that JAM formed and controlled all of these entities while acting in a fiduciary capacity as Reznor's personal manager

in the entertainment industry; given that each of these transactions involve JAM as an interested party and constitute self-dealing transactions; given that JAM never disclosed the material terms of any of these transactions; and given that Reznor never received the advice of independent counsel; Reznor did not ever give informed consent to any of these transactions. Rather, all such transactions and all benefits obtained by JAM were procured through a breach of fiduciary duty, fraud and/or are unconscionable, entitling Reznor to rescission of each of them and disgorgement of all monies or other benefits obtained by JAM.

**THE MANAGEMENT RELATIONSHIP CONTINUES**

34. In 1994, the onerous Management Agreement expired on its own terms. Reznor was now a highly respected and successful songwriter, musician and vocalist, and NIN was a multi-million unit selling act. Given that stature and the fact that the Management Agreement had expired, Reznor had the opportunity to negotiate a management agreement with JAM tailored to the level of his remarkable success, and one far more favorable than the Management Agreement. Specifically, Reznor could have negotiated, among other terms: (a) a lower commission rate; (b) sunset clauses on JAM's post-term commissions; and (c) a limit on JAM's commissions to material created only while JAM was actually managing Reznor. Relying on JAM's repeated proclamations of fairness, loyalty and honesty, and because JAM concealed his extreme misconduct, Reznor continued to work with JAM without a written agreement.

35. As Reznor's fiduciary, JAM had a duty and obligation to inform Reznor of the grossly improper terms of the 1989 Management Agreement and, more importantly, the real life application of the terms of that Agreement, so that Reznor could make an informed decision on whether to continue with JAM on the same terms, or at all. Because of Reznor's numerous other sources of commissionable income, along with JAM's self-dealing interests in all Reznor's business affairs, JAM was paid millions of dollars between the end of the Management Agreement's express term and his termination in late 2003.

36. The application of the Management Agreement on touring was that Reznor, in many instances, performed in highly successful and lucrative tours, simply to pay JAM's commissions. For example, during 1994 and 1995 NIN performed a tour entitled "Self Destruct." As the manager, JAM's primary responsibility was to manage and oversee all aspects of the tour – including selection of venues, ticket prices and production expenses – in order to maximize the profit to his fiduciary. Under JAM's control, the tour grossed approximately $7.5 million but netted, after expenses (excluding management commissions), approximately $1.5 million. Under the management agreement, JAM's 20% commission on the gross was the entire amount of all net profits. Unbeknownst to Reznor, and to both conceal his fiduciary lapses and avoid confrontation with his artist, JAM did not pay itself a commission at that time because had it done so the entire $1.5 million profit would have all gone to JAM, and Reznor would have toured approximately two years for free. JAM did not disclose these facts out of a legitimate fear that if he took all profits from the tour and Reznor understood the effect of JAM's contract, Reznor might terminate JAM. On the hugely successful NIN "Fragility" tour in 1999/2000, JAM was paid $600,000 more than Reznor. Even worse, JAM actually caused Reznor to take "tour support" advances from Interscope in an amount almost equal to JAM's commissions. The "tour support" -- which comes in the form of advances from the record company only to fund a tour shortfall -- was totally unnecessary to fund the tour. It was needed only so JAM could take millions in commissions. For another successful, but smaller, 10-day "Club" tour in 1995, JAM made over $200,000 more than Reznor.

**<u>JAM CAUSES REZNOR TO "LOAN" MILLIONS TO THE JOINT COMPANIES</u>**

37. Beginning in approximately 1996, JAM and Szekelyi engaged in a scheme to systematically divert millions of dollars from Reznor's accounts for the benefit of JAM, as set forth below.

38. At all relevant times since approximately 1996, Szekelyi was not only Reznor's and the joint entities' business manager, accountant and fiduciary, but was also JAM's business

manager. Together with JAM, Szekelyi simultaneously controlled all the money, books and records relating to all companies and Reznor.

39. In approximately 1998, Interscope stopped funding the jointly-owned label, NRI/NRLI. Without Reznor's knowledge or consent, Szekelyi and JAM began almost immediately to help themselves to the "Bank of Reznor." Specifically, they took Reznor's personal money to fund operations of the joint companies. Until Reznor discovered the abuse, defendants used their power to withdraw in excess of $3 million from "the Bank" – Reznor' personal accounts over which they had control. The withdrawals purportedly were to fund Reznor's half of the joint entities, but during the same period, Reznor's "partner" contributed only $166,000 for his half.

40. These transactions were booked by JAM and Szekelyi as "loans" from Reznor to the entities. Unlike most loans, loans from the Bank of Reznor are not formalized with notes, carry no interest, required no collateral and provided no realistic means of repayment.

41. None of the "loans" were the result of any arms length negotiation between Reznor's outside independent professionals, on the one hand, and JAM, on the other. Rather, Reznor's fiduciaries, JAM and Szekelyi withdrew money free of charge.

42. JAM's and Szekelyi's conduct is an egregious and reprehensible breach of all trust and confidence placed in them by Reznor.

43. Reznor for his part, was wholly unaware of the unconscionable and egregious nature of the foregoing until June 30, 2003. Around that time, JAM finally disclosed to Reznor that Reznor alone was paying for all the companies. In response to Reznor's request for an immediate accounting, Szekelyi and JAM prepared a rough financial statement. Reznor consulted a friend and confidant to help him more fully understand his finances. This consultation led to an investigation revealing JAM's and Szekelyi's nefarious activities. Reznor then promptly fired JAM and Szekelyi.

44. Reznor has made, and continues to make, demand for the return of all of his books, records and other property maintained in the possession, custody or control of Defendants. Defendants continue wrongfully to withhold all such property.

**FIRST CLAIM FOR RELIEF**

(Rescission Based on Breach of Fiduciary Duty Against J. Artist Management, Inc. and Malm)

45. Reznor incorporates by reference the allegations set forth in paragraphs 1 through 44, above, as though set forth herein.

46. As Reznor's manager and trusted advisor, all times mentioned herein, JAM and Malm owed a fiduciary duty to Reznor to treat him with the highest degree of good faith and honesty and to zealously protect Reznor's interests.

47. JAM breached its fiduciary duty as more specifically described above, by, among other things:

- Inducing Reznor to sign the Management Agreement, and inducing him to keep him as manager by omitting to disclose and misrepresenting material information;
- Inducing Reznor to sign the application for registration of the trade name and mark in NIN;
- Taking a 50% ownership in Object, NRI, NRLI, NI and Hot Snakes;
- Diverting more than $3,000,000 of Reznor's money to the jointly owned corporations without Reznor's knowledge; and
- On information and belief, using Reznor's and company money for personal travel, entertainment and expenses.

48. These were breaches of JAM's fiduciary duties because: (1) these transactions gave substantial benefit to JAM to the detriment of Reznor; (2) Reznor had no independent counsel in connection with any of these transactions; (3) JAM made fraudulent representations and omissions in connection with each of these transactions; and (4) none of these deals were the result of arms-length negotiations.

49. JAM concealed his misconduct until after June 30, 2003, when Reznor hired outside accountants to review the books and records.

50. As a direct and proximate result of JAM's breaches of fiduciary duties, Reznor is entitled to rescind the Management Agreement, its extension, any purported transfer granting JAM a 50% ownership in Reznor's NIN trademark and logo and the 50% ownership in any of the various entities, including but not limited to, Object, NRI, NRLI, NI and Hot Snakes.

**SECOND CLAIM FOR RELIEF**

(Rescission Based on Fraud Against J. Artist Management, Inc. and Malm)

51. Reznor incorporates by reference the allegations set forth in paragraphs 1 through 50, above, as though set forth herein.

52. As Reznor's manager and trusted advisor, at all times mentioned herein, JAM owed a fiduciary duty to Reznor to treat him with the highest degree of good faith and honesty, to zealously protect Reznor's interests and to avoid any transaction that would benefit JAM to the detriment of Reznor.

53. Based on this fiduciary duty, JAM was obligated to disclose all material facts to Reznor.

54. In 1989, JAM represented to Reznor that that the terms of the Management Agreement were standard in the industry and that signing the Management Agreement was just a formality.

55. In fact, the Management Agreement was not standard in the industry and did not contain even the most common deductions from gross compensation (such as recording costs, "sound and lights," etc.). Moreover, the Agreement was one of the most important agreements that Reznor would sign in his career, so that it all but required review by counsel. Also, the Management Agreement was extremely one-sided and provided rights and controls in JAM that were both unfair and extreme.

56. In 1989, in presenting the Management Agreement to Reznor for his signature, JAM omitted to inform Reznor that the document was only a draft prepared by Toorock based on terms JAM unilaterally dictated. JAM also omitted to disclose that Toorock had not reviewed the document on Reznor's behalf and had not otherwise provided any legal advice or counsel to protect Reznor. JAM failed to disclose that the terms set forth in the Management Agreement were not the result of negotiations between JAM and Toorock. In addition, on information and belief, JAM misled Toorock to believe that at least the commission rate and term of years had been negotiated between Reznor and JAM, when in fact they had not.

57. All such misinterpretations and omissions were material and Reznor would not have acted the way he did in blindly signing the Management Agreement had the true facts been disclosed.

58. In 1993, JAM also presented Reznor with a document that he requested Reznor sign. He told Reznor that the document was purely administrative and described it only generally as having to do with the NIN name and logo.

59. The truth was that the document was not administrative and in fact was an application to register ownership of Reznor's NIN name and logo jointly in JAM and Reznor.

60. JAM's omission in informing Reznor that the document purported to transfer half of the trademarks in the NIN name and logo to JAM was material. If Reznor had been told of the true facts, he would have never signed the document.

61. In 1993, JAM suggested to Reznor that they form Object. JAM assured Reznor that Reznor would receive its proper fair share of royalties for the sale of NIN merchandise, and that JAM would take a 20% commission on those royalties.

62. In fact, instead of paying Reznor a fair market royalty for NIN merchandise, Object was set up and paid Reznor no royalty. Instead, all monies made from the sale of NIN merchandise went to Object and JAM took half of all Reznor's royalties. Through this deceit, instead of JAM and Reznor splitting only the profit, if any, that would have been made by the merchandising company after paying a market rate royalty for artist licenses, JAM took a

royalty-free license from Reznor and half of Reznor's NIN royalties. Had Reznor known the true facts, he would have never agreed to such an arrangement.

63. In 1994, when the Management Agreement expired on its own terms, JAM represented to Reznor that it continued to be a fair, standard agreement.

64. In fact, given that Reznor was a highly successful artist, the Management Agreement was even <u>more</u> unfair in 1994 than when it was signed. Reznor had the opportunity to negotiate a management agreement with JAM (or someone else) tailored to the level of his remarkable success, and one far more favorable than the onerous Management Agreement. In reliance on JAM's misrepresentations and omissions, Reznor did not do so.

65. In 1994, in connection with the expiration of the Management Agreement, JAM concealed from Reznor that JAM was purportedly owed the entire $1.5 million profit from the "Self Destruct" tour under the terms of the onerous Management Agreement.

66. JAM did not disclose this fact out of a fear that if Reznor understood the effect of JAM's contract, Reznor would renegotiate with or terminate JAM.

67. Beginning in 1992, JAM represented to Reznor that if they formed a number of jointly owned companies, including Object, NRI, NRLI and Hot Snakes, they would share all financial risk in connection with these companies and be equally responsible for funding them. JAM would contribute his day-to-day efforts, and Reznor would use his name, influence and abilities to attract artists and business. In return, JAM and Reznor would equally share in the profits.

68. At the time JAM made these representations, JAM never intended to bear half the responsibility for funding these companies, but only to take half their profit. When money was necessary to fund the acquisitions or operations, JAM simply took the money from Reznor's accounts. Further demonstrating his fraudulent intent, JAM concealed that he was using Reznor's money, but not his own, even though he continued to take 50% of any income.

69. Had JAM disclosed that he did not intend to contribute equally to the funding of these companies, Reznor would have never agreed to joint ownership of them.

70. JAM knew that Reznor would rely on all of the above detailed material omissions and misrepresentations. In fact, JAM made such material omissions and misrepresentations with the intention that Reznor would rely on them.

71. JAM representations were in fact false and JAM knew that they were false at the time they were made.

72. Reznor was unaware of the true facts at the time JAM made the fraudulent material representations and omissions alleged herein and actually and reasonably relied on such fraudulent and intentional misrepresentations and omissions.

73. Had Reznor known about the true facts and the omissions he would have never: (1) signed the Management Agreement; (2) continued with the Management Agreement under the same terms, or at all; (3) signed the application for the trademark registration in the NIN name and mark; and (4) given JAM 50% of Object, NRI, NRLI, NI or Hot Snakes.

74. Reznor could not and did not know the fraudulent nature of these transactions until after June 30, 2003, when he received a financial statement from JAM and Szekelyi and hired other accountants to review the books and records. In fact, JAM intentionally prevented Reznor from knowing the true nature of some of these transactions, as set forth above.

75. As a direct and proximate result of the fraudulent nature of these transactions, Reznor is entitled to rescind the Management Agreement, any purported transfer of a 50% ownership in Reznor's trademarked name and logos, the 50% ownership in Object, and the agreement to split profits and the purported joint ownership of the various entities, including but not limited to, NRI, NRLI, NI and Hot Snakes.

76. JAM's conduct, as alleged herein, was oppressive, malicious and fraudulent and undertaken in conscious disregard of Reznor's property rights. Reznor is therefore entitled to an award of punitive and exemplary damages in an amount sufficient to punish and deter JAM from similar future conduct.

**THIRD CLAIM FOR RELIEF**

(Rescission Based on Unconscionability Against J. Artist Management, Inc. and Malm)

77. Reznor incorporates by reference the allegations set forth in paragraphs 1 through 76, above, as though set forth herein.

78. As Reznor's manager and trusted advisor, at all times mentioned herein, JAM owed a fiduciary duty to Reznor to treat him with the highest degree of good faith and honesty and to zealously protect Reznor's interests.

79. Despite their duty of loyalty and honesty, JAM wrongfully induced Reznor to enter into the following transactions, the details of which have been set forth above and are incorporated herein:

- The 1989 Management Agreement and its continuation;
- The purported transfer of a 50% ownership in the NIN trademarked name and logo to JAM;
- The purported transfer of a 50% ownership to JAM in the merchandising company, Object, along with the agreement to split merchandising profits;
- The purported "loans" from the Bank of Reznor; and
- The purported joint ownership of the various entities, including but not limited to, NRI, NRLI, NI and Hot Snakes.

80. JAM wrongfully and deceptively represented that all of the above transactions were fair, equitable and standard in the industry and concealed other transactions. JAM did not suggest that Reznor seek independent legal advice or speak to anyone about the terms of any of the above transactions and knew that Reznor did not do so. Indeed, JAM scrupulously avoided Toorock to conceal his inducement of Reznor's signature on the Management Agreement. At all times JAM knew Reznor was relying on JAM to honor his fiduciary responsibilities. As a result, there was a gross imbalance in the understanding and acumen of the parties in connection with the above mentioned transactions making them procedurally unconscionable.

81. These transactions are also substantively unconscionable because they unreasonably favor JAM in every respect and are highly detrimental to Reznor, as set forth in detail above and incorporated by reference herein.

82. Reznor could not and did not know the extremely unconscionable nature of the these transactions until after June 30, 2003, when he received a financial statement from JAM and Szekelyi and hired other accountants to review the books and records. In fact, JAM intentionally prevented Reznor from knowing the true nature of some of these transactions, as set forth above.

83. As a direct and proximate result of the unconscionable nature of these transactions, Reznor is entitled to rescind the onerous Management Agreement, the purported transfer to JAM of a 50% ownership in Reznor/NIN trademarked name and logo, the 50% ownership in Object and the agreement to split profits and the purported joint ownership of the various entities, including but not limited to, NRI, NRLI and Hot Snakes.

**FOURTH CLAIM FOR RELIEF**

(Damages For Breach of Fiduciary Duty Against J. Artist Management, Inc. and Malm)

84. Reznor incorporates by reference the allegations set forth in paragraphs 1 through 83, above, as though set forth herein.

85. As Reznor's manager, partner, co-owner and trusted advisor, at all times mentioned herein, JAM owed a fiduciary duty to Reznor to treat him with the highest degree of good faith and honesty, to zealously protect Reznor's interests and to accurately disclose all facts relating to all matters in which the two were involved.

86. JAM has taken advantage of the complete trust placed in him by Reznor and has breached his fiduciary duty to Reznor, by among other things:

- Inducing Reznor to sign the Management Agreement, and inducing him to keep him as manager by failing to disclose and misrepresenting material information;

- Inducing Reznor to sign the application for registration of the trade name and mark in NIN;
- Taking a 50% ownership in Object, NRI, NRLI, NI and Hot Snakes;
- Diverting more than $3,000,000 of Reznor's money to the jointly-owned corporations without Reznor's knowledge; and
- On information ad belief, using Reznor's and company money for personal travel, entertainment and expenses.

87. JAM concealed these various breaches until after June 30, 2003, when Reznor hired outside accountants to review the books and records.

88. Reznor has been damaged as a result of JAM's breach of fiduciary duties in an amount that exceeds the jurisdictional limit of this Court. Reznor presently cannot ascertain the exact amount of damages he has sustained as a direct and proximate result of these breaches, but they include, without limitation, disgorgement of management commissions in the amount dictated by law and disgorgement of profits from all the jointly-owned companies including Object, NRI, NRLI, NI and Hot Snakes.

89. JAM's actions were malicious, fraudulent and oppressive, and undertaken in conscious disregard of Reznor's property rights. Reznor is therefore entitled to an award of punitive and exemplary damages in an amount sufficient to punish and deter JAM from similar future conduct.

**FIFTH CLAIM FOR RELIEF**

(Damages For Fraud Against J. Artist Management, Inc. and Malm)

90. Reznor incorporates by reference the allegations set forth in paragraphs 1 through 89, above, as though set forth herein.

91. Based on JAM's fiduciary duty to Reznor as detailed above, JAM was obligated to disclose all material facts to Reznor.

92. As a direct and proximate result of JAM's misrepresentations and omissions detailed in paragraphs 52-74, above, Reznor has incurred actual damages in an amount subject to proof at trial. In addition, Reznor is entitled to a disgorgement of all profits made by JAM according to law. Reznor is also entitled to terminate immediately the Management Agreement and any obligation to pay any future commission.

93. JAM's conduct, as alleged herein, was oppressive, malicious and fraudulent and undertaken in conscious disregard of Reznor's property rights. Reznor is therefore entitled to an award of punitive and exemplary damages in an amount sufficient to punish and deter JAM from similar future conduct.

**SIXTH CLAIM FOR RELIEF**

(Damages For Breach Of Contract Against Defendants Malm and J. Artist Management, Inc.)

94. Reznor incorporates by reference the allegations set forth in paragraphs 1 through 93, above, as though set forth herein.

95. The Management Agreement requires JAM to:

> counsel and advise [Reznor] in all matters pertaining to [Reznor's] career in the Entertainment Industry including, without limitation ... (iii) general practices in the Entertainment Industry regarding such matters as [JAM] has knowledge, such as compensation and privileges extended for similar artistic services; ....

96. Even though pursuant to the terms of the Management Agreement, JAM specifically was obligated to "counsel and advise" Reznor on "general practices" in the entertainment industry, including Reznor's compensation, JAM failed to do so. Indeed, the advice Reznor received from JAM in connection with both the Management Agreement and the various other transaction detailed above was directly contrary to the general practices in the entertainment industry.

97. JAM breached its obligations under the terms of the Management Agreement as detailed above.

98. Reznor has performed all conditions, covenants and promises required on his part to be performed in accordance with the terms and conditions of the Management Agreement.

99. As a result of Defendants' breach of the Management Agreement, Reznor has been damaged in a sum presently unknown, but in an amount believed to be in excess of $3 million. JAM is also entitled to termination of the Management Agreement and any obligation to pay commissions or other money thereunder.

**SEVENTH CLAIM FOR RELIEF**

(For Accounting Against Defendants Malm and J. Artist Management, Inc.)

100. Reznor incorporates by reference the allegations set forth in paragraphs 1 through 99, above, as though set forth herein.

101. JAM has wrongfully collected and/or spent money pursuant to the Management Agreement and the various other transactions detailed above and incorporated herein.

102. The amount of money due from JAM to Reznor is unknown and cannot be ascertained without an accounting from JAM. Reznor is informed and believes and thereon allege that the amount owed, however, exceeds $3 million.

**EIGHTH CLAIM FOR RELIEF**

(Declaratory Relief Against Defendants Malm and J. Artist Management, Inc.)

103. Reznor incorporates by reference paragraphs 1 through 102, above, as though fully set forth herein.

104. An actual controversy has arisen, and now exists, between Reznor and JAM concerning their respective rights and duties, in that:

- Reznor contends that the Management Agreement is of no further force or effect, and that no commissions are owed to JAM currently or in the future;

- Reznor contends that he is the 100% owner of all trademarks, artwork, url's and other tangible or intellectual property related to Reznor or NIN; and
- Reznor contends that he is the 100% owner of Object, NRI, NRLI, NI and Hot Snakes.

105. Reznor desires a judicial determination of JAM's rights and duties, and a declaration that (1) the Management Agreement is of no force or effect, and that no commissions are due now or at any time in the future; (2) JAM has no ownership interest in the trademarks, artwork, url's or other tangible or intellectual property in connection with Reznor or NIN; and (3) Reznor is the 100% owner of Object, NRI, NRLI, NI and Hot Snakes.

**NINTH CLAIM FOR RELIEF**

(Damages For Negligence Against All Defendants)

106. Reznor incorporates by reference the allegations set forth in paragraphs 1 through 105, above, as though set forth herein.

107. As Reznor's personal and business managers, JAM and Szekelyi owed Reznor a duty of care, as well as a duty of loyalty. This duty of care and loyalty included, without limitation, competently representing Reznor in connection with all aspects of his career, including supervising the various tours undertaken by NIN, keeping Reznor informed regarding the expenses associated with the various tours and making sure that the tours are as profitable as possible.

108. Defendants breached their duty of reasonable care to Reznor in that they failed to exercise the degree of skill commonly exercised by an ordinary member of the personal and business manager communities in the transactions alleged herein. Specifically, Defendants failed to adequately supervise the various tours undertaken by Reznor/NIN.

109. Reznor is informed and believes that JAM failed to properly advise Reznor on touring because whether the tours were profitable or not had no effect on the amount of money

JAM would take in commission based on his one-sided Management Agreement. As set forth above, the Management Agreement entitled JAM to 20% of all gross monies earned by Reznor, without any deductions, even the customary deductions for costs associated with touring.

110. As a proximate result of Defendants' negligence, Reznor has suffered actual and ascertainable damages in an amount subject to proof at trial.

111. Defendants' conduct as alleged herein, was oppressive, malicious and fraudulent and undertaken in conscious disregard of Reznor's rights. Reznor is therefore entitled to an award of punitive and exemplary damages in an amount sufficient to punish and deter Defendants from similar future conduct.

**TENTH CLAIM FOR RELIEF**

(Conversion Against All Defendants)

112. Plaintiffs incorporate by reference paragraphs 1 through 111, above, as though fully set forth herein.

113. As alleged herein, Reznor is informed and believes and thereon alleges that all Defendants have conspired to take and have taken wrongful control and ownership of Reznor's assets and other property for their own benefit and use without authority.

114. Specifically, Defendants Szekelyi and Navigent have taken possession of Reznor's books and records and refuse to return such books and records. Moreover, Szekelyi has conspired with JAM to divert Reznor's money to JAM as "loans," as set forth herein.

115. JAM has also converted Reznor's assets for his own personal enjoyment, including meals, travel and entertainment.

116. Defendants, and each of them, refused, and still refuse, to deliver Reznor's possessions to him and have unlawfully, wrongfully and willfully converted said property and rights of Reznor to their own use.

117. As a direct and proximate result of the Defendants' conversion of Reznor's assets and funds, Reznor has been damaged in an amount subject to proof at trial but alleged to exceed Three Million Dollars ($3,000,000.00).

118. The actions of Defendants were malicious, fraudulent and oppressive, and undertaken in conscious disregard of Reznor's property rights. Reznor is therefore entitled to an award of punitive and exemplary damages in an amount sufficient to punish Defendants and set an example to others.

**ELEVENTH CLAIM FOR RELIEF**

(Damages For Breach of Fiduciary Duty Against Szekelyi and Navigent)

119. Plaintiffs incorporate by reference paragraphs 1 through 118, above, as though fully set forth herein.

120. As Reznor's business manager entrusted to advise Reznor on financial matters and with access to and control over all Reznor's money, at all times mentioned herein, Szekelyi owed a fiduciary duty to Reznor to treat him with the highest degree of good faith and honesty and to zealously protect Reznor's interests.

121. Szekelyi breached their fiduciary duty to Reznor, by among other things:

(a) taking on representation of JAM and the jointly-owned entities and acting on matters between his clients' conflicting interests by favoring JAM over Reznor, and all without Reznor's informed consent;

(b) conspiring with JAM to transfer over $3,000,000 out of Reznor's accounts in order to fund the various companies set up by JAM, without Reznor's knowledge;

(c) accepting instructions from JAM relating to Reznor's money, without informing Reznor of such instructions;

(d) failing to reveal to Reznor that there was a conflict of interests because Szekelyi represented not only Reznor and the entities Reznor co-owned

with JAM, but also JAM individually. As a result of this conflict of interests, Szekelyi has failed to protect the interests of Reznor when those interests were contrary to those of JAM and Malm, Szekelyi's other clients;

(e) failing to advise Reznor that it was in his best interest to dissolve the merchandising agreement with JAM and that he was entitled to receive a proper royalty on all licensing of his name, image, likeness and intellectual property rights; and

(f) failing to return Reznor's books and records upon request.

122. Reznor has been damaged as a result of Szekelyi's breach of fiduciary duties in an amount that exceeds the jurisdictional limit of this Court and subject to proof at trial. Reznor presently cannot ascertain the exact amount of damages which he has sustained as a direct and proximate result of these breaches, but will seek leave of Court to amend this complaint to state the exact amount of damages when it has been ascertained.

123. Szekelyi's actions were malicious, fraudulent and oppressive, and undertaken in conscious disregard of Reznor's property rights. Reznor is therefore entitled to an award of punitive and exemplary damages in an amount sufficient to punish and deter Szekelyi from similar future conduct.

**TWELFTH CLAIM FOR RELIEF**

(Damages For Fraud Against Szekelyi and Navigent)

124. Reznor incorporates by reference the allegations set forth in paragraphs 1 through 123, above, as though set forth herein.

125. As Reznor's business manager and trusted advisor, at all times mentioned herein, Szekelyi owed a fiduciary duty to Reznor to treat him with the highest degree of good faith and honesty and to protect Reznor's interests.

126. Based on these fiduciary duties, Szekelyi was obligated to disclose all material facts to Reznor. Szekelyi failed to do so, however, when in conspiracy with JAM, they transferred millions of dollars from Reznor's account in the form of "loans" to fund the various joint companies set up at JAM's direction. Szekelyi never told Reznor that these so called "loans" had no notes, no specified interest rate, no collateral and no realistic likelihood of repayment. In addition, none of the "loans" were the result of any arms length negotiation between Reznor's outside independent professionals, on the one hand, and JAM, on the other.

127. Szekelyi omitted to inform Reznor that his merchandising deal with JAM was extremely detrimental to Reznor's financial interest, and extremely beneficial to his other clients, JAM and Object. Specifically, Szekelyi did not disclose that Reznor was not being paid a royalty as is customary in the industry. Szekelyi never told Reznor that this arrangement was highly improper.

128. In addition, Szekelyi fraudulently omitted to reveal to Reznor that they had a conflict of interest because they represented not only Reznor and the entities Reznor co-owned with JAM, but also JAM and Malm individually. As a result of this conflict of interest, Szekelyi was unable to, and did not, protect the interests of Reznor when those interests were contrary to those of JAM and Malm, Szekelyi's other clients.

129. Szekelyi knew that Reznor would rely on their omissions of material fact. In fact, Szekelyi made such omissions with the intention that Reznor would rely on them.

130. Reznor was unaware of, and Szekelyi concealed, the true facts at the time Szekelyi made the omissions alleged herein and Reznor actually and reasonably relied on such omissions. Reznor did not and could not have discovered the Szekelyi omissions because Reznor placed the utmost trust and confidence in Szekelyi. It was not until June 2003 when Reznor hired outside business managers that he was able to discover the true nature of these various omissions.

131. As a direct and proximate result of Szekelyi's omissions, Reznor has incurred actual damages in an amount subject to proof at trial.

132. In addition, Szekelyi's conduct, as alleged herein, was oppressive, malicious and fraudulent and undertaken in conscious disregard of Reznor's property rights. Reznor is therefore entitled to an award of punitive and exemplary damages in an amount sufficient to punish and deter Szekelyi from similar future conduct.

**THIRTEENTH CLAIM FOR RELIEF**

(Damages for Aiding and Abetting Fraud Against Szekelyi and Navigent)

133. Reznor incorporates by reference the allegations set forth in paragraphs 1 through 132, above, as though set forth herein.

134. Szekelyi aided and abetted the fraudulent misrepresentations and omissions made by JAM set forth above. Specifically, Szekelyi was aware of the fraudulent activities undertaken by JAM set forth in paragraphs 51 - 76 above, but, instead of fulfilling their fiduciary duties to Reznor by assuring that his interests were protected, undertook actions and omissions that were intended to, and did, enable JAM to carry out and conceal his fraudulent practices.

135. As set forth more fully in paragraphs 124 - 132 above, Szekelyi provided substantial assistance to JAM in carrying out his fraudulent activities by, among other things: (a) with JAM, transferring millions of dollars from Reznor's personal accounts in the form of "loans" to fund the various joint companies set up at JAM's direction, and failing to disclose to Reznor the true nature of these purported "loans"; (b) failing to inform Reznor that Reznor's merchandizing deal with JAM was improper and detrimental to Reznor's financial interests, and unduly beneficial to the interests of JAM; and (c) concealing the fact that they had a conflict of interest arising from their representation of JAM and Malm individually while concurrently representing Reznor and the entities Reznor co-owned with JAM.

136. Szekelyi knew that Reznor would rely on their omissions of material fact and Reznor reasonably and justifiably relied on such omissions. With Szekelyi's assistance, the fraudulent practices described herein remained undetected until June 2003, when Reznor hired outside business managers.

137. By reason of the foregoing, Reznor has been damaged in an amount to be proven at trial.

138. Szekelyi's actions were malicious, fraudulent and oppressive, and undertaken in conscious disregard of Reznor's property rights. Reznor is therefore entitled to an award of punitive and exemplary damages in an amount sufficient to punish and deter Szekelyi from similar future conduct.

## FOURTEENTH CLAIM FOR RELIEF

(Damages For Professional Malpractice Against Szekelyi and Navigent)

139. Reznor incorporates by reference the allegations set forth in paragraphs 1 through 138, above, as though set forth herein.

140. As Reznor's business manager, Szekelyi owed Reznor a duty of care, as well as a duty of loyalty. This duty of care and loyalty included, without limitations, competently representing Reznor in connection with his affairs with JAM, including regarding Reznor's merchandising contracts and funding of the various jointly-owned companies.

141. By the acts and omissions alleged herein, Szekelyi breached their duty of reasonable care to Reznor in that they failed to exercise the degree of skill commonly exercised by an ordinary member of the business management community in the transactions alleged herein. Specifically, Szekelyi failed to adequately advise and counsel Reznor in connection with his merchandising and funding of the jointly-owned companies.

142. Reznor has suffered actual and ascertainable damages proximately caused by Szekelyi's negligence in an amount subject to proof at trial.

143. Szekelyi's conduct as alleged herein, was oppressive, malicious and fraudulent and undertaken in conscious disregard of Reznor's property rights. Reznor is therefore entitled to an award of punitive and exemplary damages in an amount sufficient to punish and deter Szekelyi from similar future conduct.

WHEREFORE, plaintiff Reznor seeks judgment as follows:

(1) On the First Claim for Relief:

(a) Rescission of any obligation to pay money under the Management Agreement and the continuation of that agreement in any form;

(b) Rescission of any purported transfer of any interest in the NIN name, logo or any other Reznor-related intellectual property;

(c) Rescission of any ownership by JAM in Object, NRI, NRLI, NI and Hot Snakes;

(d) An order of restitution of any money or thing owing;

(e) An award of consequential damages in an amount to be proven at trial; and

(f) An award of punitive damages.

(2) On the Second Claim for Relief:

(a) Rescission of any obligation to pay money under the Management Agreement and the continuation of that agreement in any form;

(b) Rescission of any purported transfer of any interest in the NIN name, logo or any other Reznor-related intellectual property;

(c) Rescission of any ownership by JAM in Object, NRI, NRLI, NI and Hot Snakes;

(d) An order of restitution of any money or thing owing;

(e) An award of consequential damages in an amount to be proven at trial; and

(f) An award of punitive damages.

(3) On the Third Claim for Relief:

(a) Rescission of any obligation to pay money under the Management Agreement and the continuation of that agreement in any form;

(b) Rescission of any purported transfer of any interest in the NIN name, logo or any other Reznor-related intellectual property;

(c) Rescission of any ownership by JAM in Object, NRI, NRLI, NI and Hot Snakes;

(d) An order of restitution of any money or thing owing;

(e) An award of consequential damages in an amount to be proven at trial; and

(f) An award of punitive damages.

(4) On the Fourth Claim for Relief:

(a) Damages in an amount to be determined at trial, according to proof; and

(b) Punitive damages.

(5) On the Fifth Claim for Relief:

(a) Damages in an amount to be determined at trial, according to proof; and

(b) Punitive damages.

(6) On the Sixth Claim for Relief, such damages as Reznor has sustained as a consequence of JAM's and Malm's breach of the written Agreement, in an amount to be proven at trial.

(7) On the Seventh Claim for Relief:

(a) An accounting of any funds misappropriated from Reznor; and

(b) An order that all funds misappropriated by Defendants, and any profits generated or property acquired with such funds be held in constructive trust for the use and benefit of Reznor.

(8) On the Eighth Claim for Relief, a judicial declaration that:

(a) the Management Agreement is rescinded such that Reznor owes no further commission for any reason;

(b) JAM has absolutely no ownership interest in the trademarks, artwork, url's or other tangible or intellectual property in connection with Reznor or NIN; and

(c) Reznor is the 100% owner of Object, NRI, NRLI and Hot Snakes.

(9) On the Ninth Claim for Relief:

(a) Damages in an amount to be determined at trial, according to proof; and

(b) Punitive damages.

(10) On the Tenth Claim for Relief:

(a) Damages in an amount to be determined at trial, according to proof;

(b) An order requiring the return of all books, records, money and any other personal property belonging to Reznor; and

(c) Punitive damages.

(11) On the Eleventh Claim for Relief:

(a) Damages in an amount to be determined at trial, according to proof; and

(b) Punitive damages.

(12) On the Twelfth Claim for Relief:

(a) Damages in an amount to be determined at trial, according to proof; and

(b) Punitive damages.

(13) On the Thirteenth Claim for Relief:

(a) Damages in an amount to be determined at trial, according to proof; and

(b) Punitive damages.

(14) On the Fourteenth Claim for Relief:

(a) Damages in an amount to be determined at trial, according to proof; and

(b) Punitive damages.

(15) For interest and the costs of this action, including attorneys' fees (including attorneys fees pursuant to the Management Agreement); and

(16) For such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff Michael Trent Reznor hereby requests a trial by jury on each claim for relief alleged in the complaint.

Dated: May 19, 2004

KATTEN MUCHIN ZAVIS ROSENMAN

By: ____________________
Steven Shiffman (SS-3630)
575 Madison Avenue
New York, New York 10022
212-940-8880

Attorneys for Plaintiff Michael Trent Reznor

and

KATTEN MUCHIN ZAVIS ROSENMAN
Zia F. Modabber (pending admission *pro hac vice*)
Nayssan L. Parandeh (pending admission *pro hac vice*)
2029 Century Park East, Suite 2600
Los Angeles, California 90067
(310) 788-4400

Attorneys for Plaintiff Michael Trent Reznor

AGREEMENT made as of this 20TH day of April, 1989, by and between J ARTIST MANAGEMENT, P.O. Box 15681, Cleveland, Ohio 44116 -and- TRENT REZNOR, of

(referred to herein as "you").

WITNESSETH

In consideration of the mutual covenants and promises herein contained, the parties hereby agree as follows:

1. The term of this Agreement (the "Term") shall be for a period of five years commencing on the date hereof.

2. You hereby engage Company, during the Term hereof, as your exclusive personal manager, representative and advisor, throughout the world, with respect to all your activities throughout the Entertainment Industry, and Company hereby accepts such engagement.

3. (a) Company shall confer with, counsel and advise you in all matters pertaining to your career in the Entertainment Industry including, without limitation (i) the selection of literary, artistic and musical material; (ii) all matters pertaining to publicity, public relations and advertising; (iii) general practices in the Entertainment Industry regarding such matters as Company has knowledge, such as compensation and priveleges extended for similar artistic services ; (iv) the selection of, and negotiation with, theatrical booking agencies and other third parties that seek and procure employment and engagements for artists; and (v) the selection of, and negotiation with, any and all potential users of your talents.

(b) You shall immediately advise Company of all offers of employment, and of all inquiries concerning your career, so that Company may determine and advise you whether same are compatible with your career.

(c) You hereby acknowledge that Company is not licensed under the Labor Code of the State of Calfornia as a talent agent or as an employment agent or otherwise under the Business and Professions Code of the State of California, or as a theatrical employment agency or other employment agency under the General Business Law of the State of New York or as any of the foregoing under the laws of any State, and that Company has not promised to procure employment or engagements

for you, and that Company shall not be obligated to procure any employment or engagements for you hereunder. You shall be solely responsible for payment of all necessary commissions to booking or similar agencies.

4. You hereby irrevocably authorize and appoint Company as your true and lawful agent and attorney-in-fact to:

(a) direct for you, and in your name, public relations firms representatives, attorneys, accountants, and other persons, firms and corporations in connection with your business and financial affairs;

(b) execute for you, in your name, and on behalf of you, any and all short-term agreements, documents and contracts for your services, talents, artistic and literary creations. As used in the preceding sentence, "short-term" shall mean three consecutive days or less;

(c) approve and permit the use of your name (actual and professional), photograph, likeness, sound effects, caricature, and the like for purposes of advertising of any and all products and services and for any other purpose whatsoever, provided however that you have pre-approved any such permitted element;

(d) collect and receive all Gross Compensation payable to you; endorse your name; deposit or cash any and all checks payable to you; and retain any sums owing to Company; and

(e) with your consent, such consent not to be unreasonably withheld, audit and examine books and records of parties with whom you have contractual audit rights to audit and examine books and records.

5. (a) In consideration of the services rendered by Company to you hereunder, you hereby irrevocably assign to Company, and you shall pay to Company, as and when received by you or applied in your behalf, a sum equivalent to twenty (20%) percent of your Gross Compensation (the "Fee").

(b) The Fee shall be paid to Company as and when said Gross Compensation is received by you, without any limitation of time, directly or indirectly, or by any person, firm or corporation on your behalf pursuant to (i) any and all contracts, engagements and commitments now in existence, (ii) any and all contracts, engagements and commitments entered into or negotiated during the Term hereof, (iii) any and all extensions, additions, substitutions, renewals, replacements, modifications and amendments of all such contracts,

engagements and commitments refered to in (i) and (ii) above, (iv) any and all copyrights and publishing rights in musical compositions written, composed, arranged or adapted in whole or in part by you prior to or during the Term of this Agreement, and (v) any and all judgments, awards, settlements, payments, damages and proceeds relating to any suits, claims, actions, proceedings or arbitration proceedings arising out of alleged breach, non-performance or infringement by others of any of the contracts, engagements, commitments, other agreements or rights referred to in (i), (ii), (iii) and (iv) above, all of which regardless of when entered into, when performed and when effective. Any monies due to Company resulting from subparagraph 5(b)(v) above, shall be computed after first deducting counsel fees and disbursements. Notwithstanding anything to the contrary contained in paragraph 5(b)(iv) above, Company shall only receive its Fee with respect to any musical compositionsyou have written and Company shall not have any ownership interest in same.

(c) You agree that you shall pay all your expenses which may arise in connection with your activites in the Entertainment Industry including, but not limited to, the cost of material, equipment, facilities, transportation, lodging and living expenses, costumes, make-up, accounting and legal fees, and Company shall not have any liability whatsoever in such connection. Company shall not be required to travel to meet with you at any particular place; however, when Company travels on your behalf it shall be at your sole expense. You agree to reimburse Company for all expenses (sometimes hereinafter, "Expenses") which Company advances or incurs on your behalf hereunder, including, but not limited to, the cost of all long distance telephone calls, transportation undertaken by Company at your request or with your consent and all lodging and living expenses connected therewith. Company shall have the right to deduct all Expenses incurred by Company on your behalf whenever Company receives Gross Compensation. Notwithstanding anything to the contrary, Company shall not incur any Expense in excess of $500.00, without first obtaining your written consent, which consent shall not be unreasonably withheld.

(d) You shall notify and irrevocably direct and cause any and all third parties to pay directly to Company the Fee due to Company hereunder, and such Fee shall be payable to Company immediately upon payment or credit to you or any person on your behalf of the Gross Compensation upon which such Fee is based. The aforesaid direction to any such third party shall be included in any and all agreements of every nature and kind in respect of your activities in and throughout the Entertainment Industry, including, without

limitation, recording agreements, publishing agreements and agency agreements and shall be substantially as follows:

"TRENT REZNOR p/k/a NINE INCH NAILS (the "undersigned") hereby irrevocably authorizes and directs you to pay to J ARTIST MANAGEMENT, Inc., or its asignee, a sum equal to twenty (20%) percent of all sums due to, or paid on behalf of, the undersigned hereunder. Such payment shall be made at the same time that payments are due to, or paid on behalf of, the undersigned hereunder. Each payment shall be accompanied by a duplicate of the statement rendered to the undersigned. This provision may not be altered, waived or eliminated without prior written consent of J Artist Management" M.ZA.

(c) The interest and compensation set forth hereinabove which shall be paid to Company shall be a continuing interest , and shall not be revocable at your pleasure. It is intended by you to create an agency coupled with an interest and the appointment and engagement of Company and Company's right to receive the Fee as provided for herein are the inducements for Company to enter into this Agreement.

6. (a) The parties hereby acknowledge that from time to time during the Term hereof, Company or other persons or entities (i) that are owned and/or controlled by Company, or (ii) that, own and/or control Company, or (iii) that are in common ownership and/or control with Company ("Company's Affiliates"), may package an entertainment program in which you are engaged as an artist, or may act as the entrepreneur or promoter of an entertainment program in which you are engaged as an artist, or may engage you in connection with the recording and/or production of phonograph records, or as a songwriter, composer, arranger or otherwise in connection with the creation of literary or musical works. Any such activity on the part of Company or Company's Affiliates shall not (A) constitute a breach of this Agreement or of Company's fiduciary obligations and duties to you, or (B) in any way affect Company's right to its Fee hereunder in all instances not covered by the exceptions hereinafter set forth.

(b) Company shall not be entitled to its Fee from you in connection with any monies or other considerations derived by you (i) from any employment or agreement whereunder you are employed by Company (or Company's Affiliates) in which Company (or Company's Affiliates) is acting as (A) the packager of the entertainment program in which you are so employed, or (B) your music or literary publisher, or (C) your record company; or (ii) from the sale, license or grant of any literary or musical rights to Company (or Company's Affiliates).

(c) You understand and agree that Company shall not render nor shall Company be obligated to render the personal management services contemplated in this Agreement with respect to the aforesaid non-commissionable activities, and in connection therewith, you shall have the right to seek and retain independent advice.

7. (a) You and Company shall mutually agree upon the selection of a certified public accountant or accountant (sometimes herein called the "Accountant"), which Accountant shall have the right to collect and receive, on your behalf, all of your Gross Compensation hereunder in one or more segregated bank accounts in your name. The Accountant and any and all successors shall acknowledge and assume all of the obligations under this Agreement that relate to the Accountant's function. In this connection you shall notify and irrevocably direct any and all third parties to pay all Gross Compensation directly to the Accountant, except as otherwise provided in paragraph 5(d) above. Furthermore, you shall irrevocably authorize, direct and cause the Accountant to pay Company the Fee and any reimbursement or payment of Expenses from the first monies received with respect to the preceding month's receipts and credits, and due Company hereunder, within the fifteenth (15th) day of each calendar month during the Term of this Agreement and thereafter so long as Company is entitled to receive Company's Fee, together with a written accounting statement. Said accounting statement shall, among other things, set forth all gross monies received by the Accountant on your behalf hereunder during the preceding month, specifying the source thereof and the deductions therefrom for Company's Fee hereunder.

(b) In the event that the services of the Accountant initially selected hereunder are terminated, or the services of any other Accountant are terminated, then Company and you shall mutually agree upon a certified public accountant to replace the Accountant. However, it is agreed by the parties hereto that in no event shall any such Accountant's services actually be terminated hereunder: (i) without the prior approval of both you and Company; and (ii) prior to the engagement by you and Company of the accountant who shall replace the Accountant who is to be terminated pursuant to the terms and conditions hereof.

(c) Except as expressly set forth in paragraph 5(d) above, in the event that you or Company or any party on your or Company's behalf, as the case may be, shall receive any Gross Compensation hereunder, you or Company, as the case may be, shall forthwith remit all such sums directly to the Accountant.

8. You agree that Company and Company's representatives may inspect and audit your Books and Records to ascertain the amounts the amounts due Company, and Company agrees that you and your representatives may inspect and audit those portions of Company's Books and Records which concern you. The aforementioned audits and/or inspections, if any, shall be conducted upon reasonable notice to the party to be audited or inspected. "Books and Records" as used herein shall include ledgers, journals, receipt books, checks and all other records concerning financial matters.

9. You hereby acknowledge that Company's position hereunder is that of an independent contractor. Company's services are not exclusive to you and Company shall be permitted to perform the same or similar services for other artists or persons during the Term of this Agreement. Company shall be permitted to devote such time and efforts to other business activities as Company may deem necessary or desirable, in Company's sole discretion.

10. (a) You hereby warant and represent that:

(i) You have the right to make and enter into this Agreement and to grant all of the rights herein granted to Company, and that you are not now under contract to any other personal manager;

(ii) You will, at all times during the Term hereof, devote yourself to your professional career in the Entertainment Industry and to do all things necessary and desirable to promote your career and earnings therefrom;

(iii) You shall not publicly appear or perform for anyone, directly or indirectly , except through Company, as your personal representative, and under Company's direction, without Company's prior written consent, which consent shall not be unreasonably withheld.

(b) You shall at all times defend, indemnify and hold harmless Company and Company's Affiliates from and against any and all claims, damages, liabilities, costs and expences, including legal expenses and reasonable counsel fees, arising out of any alleged breach or breach by you of any warranty, representation or agreement made by you herein. You will reimburse Company and Company's Affiliates, on demand, for any payment made at any time after the date hereof in respect of any liability or claim in respect of which Company or Company's Affiliates are entitled to be indemnified. In the event you fail to so reimburse Company and

Company's Affiliates, Company may deduct such payments from any and all Gross Compensation received by Company hereunder.

11. (a) You acknowledge and agree that Company's right to represent you as your sole and exclusive personal manager and your obligation to solely and exclusively use Company in such capacity are unique, irreplaceable and extraordinary rights and obligations and that any breach or threatened breach by you thereof shal be material and shall cause Company immediate and unavoidable damages which cannot be adequately compensated for by a money judgment. Accordingly, you agree that, in addition to all other forms of relief and all other remedies which may be available to Company in the event of any such breach or threatened breach by you, Company shall be entitled to seek injunctive or other equitable relief against you to enforce Company's rights hereunder.

(b) If at any time you fail, for any reason whatsoever, to fulfill or perform any obligation assumed by you hereunder, then, without limiting Company's rights, Company shall have the right, exercisable at any time by notice to you, to extend the expiration date of the then current period of the Term. Such extension shall continue until you have fully cured such failure and the then current period of the Term shall be extended for a period of time equal to the duration of any such failure.

12. As used in this Agreement, the following terms shal have the meanings set forth below:

(a) "Entertainment Industry"-includes, without limitation, all services and activities in such fields of endeavor as phonograph records (including but not limited to recording and production), transcriptions, musical and/or dramatic performances, singing, radio, television, motion pictures, music, personal appearances, concerts, roadshows, tours, cafe and cabaret performing, hotel, restaurant and private function performing, literary and theatrical engagements, radio and television commercials, commercial merchandising endorsements and tie-ins and for all and any other media of entertainment for which you may be or become qualified; and the sale, lease or other disposition of musical, literary, dramatic or other artistic material which you may create, compose, write or collaborate, directly or indirectly, in whole or in part, in any and all fields; and any act, unit or package show of which you may be the owner or part owner, directly or indirectly.

(b) "Gross Compensation"-includes, without limitation, any and all forms of income, payments,

consideration, compensation, sums, emoluments or any other thing of value, including salaries, advances, fees, royalties, bonuses, gifts, shares of receipts, stock and stock options, paid to you or applied for your benefit directly or indirectly (i.e., any corporation, partnership, or other entity in which you have an interest), regardless of by whom procured, as a result of your activities in and throughout the Entertainment Industry.

13. Company may assign this Agreement to any third party or to any of Company's Affiliates or to any person or entity owning or acquiring a substantial portion of the stock or assets of Company, provided that Artist Management remains actively involved in the management of your career in the Entertainment Industry. You may not assign this Agreement or any of your rights hereunder, and any such attempted assignment shall be void. This Agreement shall also be binding upon any entity which, directly or indirectly, in whole or part, through one or more intermediaries, owns or controls, is owned or controlled by, or is under common ownership or control with, you (a "Controlled Entity"). Accordingly, this Agreement is hereby accepted by you on behalf of each Controlled Entity.

14. Company shall have the right during the Term hereof to obtain life insurance on your life at Company's sole cost and expense, with Company being the sole beneficiary thereof and in an amount to be determined by Company in Company's sole discretion. You shall fully cooperate in connection with the obtaining of same and you shall submit to a physical examination and complete any and all documents necessary or desirable in respect thereof. You hereby acknowledge that neither you nor your estate shall have any right to claim benefits of any such policy obtained by Company.

15. Except as otherwise specifically provided herein, all notices hereunder shall be in writing and shall be given by registered or certified mail or telegraph (prepaid), at the respective addresses set forth in this Agreement, or such other address or addresses as may be designated by either party. Such notices shall be deemed given when mailed or delivered to a telegraph office, except that notice of change of address shall only be effective from the date of its receipt. A copy of all notices given by you to Company must be sent to Michael S. Tocrock, Esq., 605 Third Avenue, Suite 1501, New York, New York 10158.

16. (a) This Agreement contains the entire understanding of the parties hereto relating to the subject matter hereof and cannot be changed or terminated by you

except by an instrument signed by an officer of Company. A waiver by either party of any term or condition of this Agreement in any instance shall not be deemed or construed as a waiver of such term or condition for the future, or of any subsequent breach thereof. All remedies, rights, undertakings, obligations, and agreements contained in this Agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either party.

(b) No breach of this Agreement on the part of either party shall be deemed material, unless the party claiming a breach shall have given the other party notice of such breach and the party receiving such notice shall fail to cure such breach, within sixty (60) days after receipt of such notice if such breach is reasonably capable of being fully cured within such sixty (60) day period; or if such breach is not reasonably capable of being fully cured within such sixty (60) day period, if the party receiving such notice commences to cure such breach within such sixty (60) day period and proceeds with reasonable diligence to complete the curing of such breach.

(c) Nothing in this Agreement shall be construed to create a partnership or joint venture between Company and you.

(d) This Agreement has been entered into in the State of New York, and the validity, interpretation and legal effect of this Agreement shall be governed by the laws of the State of New York applicable to contracts entered into and performed entirely within the State of New York. The New York courts, only, will have jurisdiction of any controversies regarding this Agreement; and, any action or other proceeding which involves such a controversy will be brought in the courts of the State of New York, and not elsewhere. Any process in any action or proceeding commenced in the courts of the State of New York arising out of any such claim, dispute or disagreement, may, among other methods, be served upon you by delivering or mailing the same, via registered or certified mail, addressed to you at the address first above written or such other address as you may designate pursuant to paragraph 15 hereof. Any such delivery or mail service shall be deemed to have the same force and effect as personal service within the State of New York.

(e) If any part of this Agreement shall be determined to be invalid or unenforceable by a court of competent jurisdiction or by any otrher legally constituted body having jurisdiction to make such determination, the

remainder of this Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto set their hands on the date and year first above written.

J ARTIST MANAGEMENT

by________________________

________________________
TRENT REZNOR
Social Security #__________

REDACTED