UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
MICHAEL TRENT REZNOR,                 :
                                      :
                Plaintiff,            :        04 Civ. 3808 (JSR)
                                      :
                -v-                   :        MEMORANDUM ORDER
                                      :
J. ARTIST MANAGEMENT, INC., JOHN A.   :
MALM, JR., RICHARD SZEKELYI, and      :
NAVIGENT GROUP,                       :
                                      :
                Defendants.           :
------------------------------------ x

JED S. RAKOFF, U.S.D.J.

         This case derives from the fifteen-year professional

relationship between plaintiff Michael Trent Reznor, the lead singer

in the rock band Nine Inch Nails ("NIN"), and defendant John A. Malm,

Jr., Reznor's long-time manager -- a relationship that ended in

cacophony and discord in late 2003.  Reznor charges Malm and his

wholly owned management company, J. Artist Management ("JAM") with

fraud, breach of contract, breach of fiduciary duty, and various

other claims (ten counts in all); and Malm and JAM in turn assert

eight counterclaims against Reznor.  Reznor also makes six claims

against Richard Szekelyi and his company, Navigent Group, accountants

involved in certain of the underlying transactions.

         With discovery completed, all parties now move for summary

judgment.  For purposes of these motions, the relevant facts are as

follows:[1]

--------------------

        [1]Because the Court must treat certain facts differently for
purposes of each party's summary judgment motion, it states where
there is a dispute of consequence and construes each disputed
fact most favorably to the non-moving party depending on which
motion is being considered.

Reznor and Malm met in 1985.  Deposition of John A. Malm, Jr., 9/22/04 ("Malm Dep."), at 7.  Reznor was a "bit player" in a Cleveland band called the Exotic Birds, while Malm worked in his family's machine equipment business by day and by night was a part-time promoter of local music acts, including the Exotic Birds. Deposition of Michael Trent Reznor, 10/12/04 ("Reznor Dep."), at 20; Malm Dep. at 227-28.  Malm caused JAM to be incorporated in Ohio in 1985, Affirmation of John A. Malm, Jr., 11/19/04, ¶ 2, but otherwise operated without much formality and, as of 1989, had never managed an artist pursuant to a written management agreement.  Id. ¶ 13.  Reznor and Malm became friends, and when Reznor left the Exotic Birds and began working on his own, around 1987, Malm informally became his manager, without a written contract.  Id. ¶ 3; Reznor Dep. at 91-92.

At first, Reznor had very little income, and Malm paid for such expenses as equipment, recording costs, and even Reznor's rent. Reznor Dep. at 92-94.  However, Reznor's career took off quickly once NIN was formed.  NIN performed its first show in 1988, see Malm Dep. at 17-18, and by later that same year had attracted interest from recording companies.  JAM (through Malm) then retained an attorney, Michael Toorock, Esq., to assist in negotiating a record contract between Reznor and TeeVee Toons, Inc. ("TVT").  Declaration of Michael Toorock, 12/2/04 ("Toorock Decl."), ¶ 3.  Toorock understood himself to be representing Reznor's interests and not those of Malm, who was not a party to the negotiations.  Id. ¶ 2.  However, he never talked directly to Reznor; all of his communications went through

Malm as Reznor's agent.  See Transcript, 1/10/05 ("Tr."), at 5.[2]

This was in accord with Reznor's apparent practice, which was to

leave such matters to various agents and professionals.[3]

In early 1989, NIN signed a recording contract with TVT, Malm

Decl. ¶ 4, and its first album was released that year.  Malm Dep. at

171.  With Reznor starting to become successful, Malm wanted a formal

management agreement, id. ¶ 6, and had Toorock prepare one, id. ¶ 7.

This agreement, signed on April 20, 1989 (the "1989 Agreement"), is

at the heart of the instant dispute.  See 1989 Agreement, attached to

Affirmation of Steven Shiffman in Opposition to JAM and Malm, 12/3/04

("Shiffman Opp.-Malm Aff."), as Exhibit 1.

Malm asserts that he did not supply Toorock with any of the

terms of the 1989 Agreement and that Toorock simply sent him a

standard management agreement.  Malm Decl. ¶ 7.  Toorock, on the

other hand, states that while he used as a template a management

agreement relating to another client, Toorock Decl. ¶ 4, Malm

specified such material terms as duration (five years) and price (a

commission rate of 20 percent[4]).  Id. ¶ 3.  Toorock further avers

that Malm told him that Malm and Reznor had discussed and agreed to

_____

[2]In an attempt to clarify some of the many gaps and
ambiguities in the record, the Court heard in-court testimony
from Toorock on January 10, 2005.  See Fed. R. Civ. P. 43(e).

[3]See, e.g., Deposition of Ross Rosen, 9/14/04, at 161-63;
Deposition of Anthony LaPlaca, 10/5/04, at 32; Deposition of Mark
Svat, 10/6/04, at 31; Deposition of Anthony Sejba, 10/13/04, at
9-10; Deposition of Anthony Flowers, 10/4/04, at 28-29.

[4]Toorock does not, however, allege that Malm told him how
the 20 percent was to be computed, i.e., as a percentage of gross
compensation.

those terms, but had not completed discussions of certain other terms, so that the draft Toorock provided was not to be the final one. Id.; Tr. at 4-5. Toorock says he told Malm that he was providing the draft "so that the two of them could see what a management agreement looked like," and that he did not want to come between Malm and Reznor by representing either of them as discussions continued. Tr. at 6-7. Only "years later" did Toorock discover that his draft had been signed as prepared and had become the 1989 Agreement between Malm and Reznor. Toorock Decl. ¶ 5.

In any event, it is undisputed that Reznor and Malm did not, in fact, discuss specific terms before Malm presented the 1989 Agreement to Reznor. Instead, Malm simply asked Reznor whether Reznor was "open to the concept" of a management agreement and Reznor said he was. Reznor Dep. at 179. At Reznor's apartment in Ohio, on April 20, 1989, Malm showed Reznor the 1989 Agreement, explained basic terms such as the 20 percent commission, said Toorock had drawn up the contract in conformance with industry standards, and assured Reznor that, while Reznor was free to have someone else look at the contract, it was "fair." Id. at 179-80. Reznor says he "may have glanced through it," but because of his trust in Malm, he signed the contract right there. Id. at 180. Both parties agree there was no discussion of the terms that now are the subject of this litigation. See Malm Dep. at 175.

As noted, the 1989 Agreement had a duration of five years, during which time JAM was to receive 20 percent of Reznor's gross compensation, 1989 Agreement ¶¶ 1, 5(a). Under the Agreement, JAM

4

was obligated to "confer with, counsel and advise [Reznor] in all matters pertaining to [his] career," including "general practices in the Entertainment Industry regarding such matters as [JAM] has knowledge, such as compensation and privileges extended for similar artistic services." Id. ¶ 3(a). The contract also permitted JAM to direct lawyers and accountants to work on Reznor's behalf. Id. ¶ 4(a). In return, JAM was to be paid its 20 percent commission on any contracts or engagements then in existence, any entered into or negotiated during the agreement's term, any extensions of such contracts, and any proceeds from any copyrights in music composed during the agreement. Id. ¶ 5(b).[5] JAM's commissions were to be paid "as and when said Gross Compensation is received by [Reznor]," id., and was to be payable to JAM "immediately upon payment or credit to [Reznor]." Id. ¶ 5(d).

In 1991, Interscope acquired Reznor's recording contract from TVT, Malm Aff. ¶ 9. As part of the transfer, new agreements were reached that obligated Reznor and NIN to record seven albums distributed by Interscope (of which, as noted, three are still to be produced). Malm Dep. at 240-41; Reznor Decl. ¶ 3. In addition, Interscope agreed to allow Reznor and Malm to form their own record

---

[5]This clause is interpreted by Malm as entitling JAM to continuing commissions on Reznor's future income derived from contracts signed while the agreement was in force. The amount of money so implicated by this clause is potentially quite large, since, while the 1989 Agreement was in effect, Reznor signed a seven-record deal with a company called Interscope Records ("Interscope"), on which he still must deliver three more albums. Malm argues that he is entitled to a 20% commission on these albums, as well as on any royalties Reznor has earned or will earn from his existing Interscope albums.

label.  See Reznor Letter of June 13, 1991, attached to JAM Defs.'
Rule 56.1 Statement ("JAM Rule 56.1 Statement") as Exhibit 6.  The
resulting company, Nothing Records, Inc. ("NRI") was incorporated in
1993, with Reznor and Malm each owning 50 percent shares and Malm the
manager.  Malm Dep. at 244; Reznor Dep. at 63.

Meanwhile, as a result of NIN's growing success, Reznor and
Malm created another company in 1993, J. Artist Management
Merchandise, Inc. ("JAMM"), to sell the band's merchandise.  See
Action by Unanimous Consent of the Directors, attached to JAM Rule
56.1 Statement.  Reznor and Malm were JAMM's sole directors.  Id.
According to Malm, Reznor had wanted to create a merchandising
company as early as 1989 because he wanted tighter quality control
over products associated with NIN.  Malm Dep. at 686-87.  Malm says
the duo intended to evenly split profits derived from sales of
merchandise.  Id. at 691-92.  Reznor, on the other hand, says JAMM
was created at Malm's suggestion, after Malm told him other
merchandising companies were not making good offers.  Reznor Dep. at
226-27.  He says he never realized the profits would be split evenly,
as opposed to Malm collecting his 20 percent commission.  Id. at 13-
14.

On July 20, 1993, applications for trademark registration of
the name "Nine Inch Nails" and the band's logo were filed jointly on
behalf of Reznor and JAM by attorney Richard Minnich, Esq.  See 1993
Trademark Applications, attached to JAM Rule 56.1 Statement as
Exhibits 10 & 11.  Reznor's signature appears on this application.
However, he says that his understanding was that he would be the sole

owner of the trademark and that he never intended to give half
ownership to Malm. Reznor Dep. at 175-76, 295. Reznor also says he
did not read the paragraph that stated that Reznor and JAM would co-
own the mark. Id. at 299. Toorock's law partner, Ross Rosen, Esq.,
asserts that, when he asked Malm about the co-ownership, Malm replied
that he did not consider himself to own the trademark and that his
name was only on the registration so he would have the authority to
act against infringers without bothering Reznor. Deposition of Ross
Rosen, 9/14/04, at 190.

On March 19, 1998, Minnich and his colleague Mark Svat, Esq.,
filed another joint application for a trademark on behalf of Reznor
and JAM, this time for two logos. 1998 Trademark Application,
attached to JAM Rule 56.1 Statement as Exhibit 12. While a signature
purporting to be Reznor's appears, Reznor denies that the signature
is his, Reznor Dep. at 307, and the signature clearly differs from
the one on the 1993 application. When attempting to renew the 1993
trademarks in 2003, Malm asked the lawyers why he could not simply
sign the application himself and told them it was difficult getting
ahold of Reznor for his signature. Deposition of Mark Svat, Esq.,
10/6/04, at 14-16, 24. Informed that he could sign alone if he
represented that he had Reznor's authority to sign on Reznor's
behalf, Malm did so. See Svat Letter, 11/18/03, attached to Shiffman
Opp.-Malm Aff. as Exhibit 5. Malm, however, had not discussed this
particular matter with Reznor; indeed, he never discussed "any of
this stuff" with Reznor, who, after discussing the initial trademark

registrations with Malm, told Malm to "just handle it."  Malm Dep. at
667-68.

     In 1994, the 1989 agreement expired by its own terms.  At
Malm's request, Toorock prepared two draft agreements substantially
identical to the 1989 agreement, although they also contained new
language clarifying that JAM would not receive commissions on income
Reznor derived from companies owned by Malm.  Tr. at 11-12.  The only
difference between the two drafts was that one contained a sunset
clause and the other did not.  Malm Dep. at 427; Toorock Letter,
9/30/03, attached to JAM Rule 56.1 Statement as Exhibit 15.
According to Malm, once again he did not specify any terms.  Id. at
427-28.  According to Toorock, Malm requested the changed language
regarding commissions and said he and Reznor had agreed to all the
terms except the sunset clause, which they had discussed but on which
they had not decided.  See Tr. at 9.  In any case, neither agreement
was ever signed, and the parties continued acting as if there had
been no change in their relationship.  See Malm Dep. at 429; Reznor
Dep. at 196-96.

     Reznor and NIN released their second album in 1994 and then
embarked on their first international tour, which ended in early
1995.  Malm Aff. ¶ 20.  While the tour earned $1.5 million in
profits, according to Malm that amounted to only 20 percent of gross
revenues, and so Malm was entitled to all of it under the terms of
the management agreement.  Id.; Malm Dep. at 771.  However, Malm was
not paid his full commission from the tour in cash.  Malm Aff. ¶ 21;
Reznor Dep. at 151.  Some of the money Malm claimed to be owed was

paid him in the form of half ownership of a new holding company, Hot Snakes, that was formed on April 20, 1995 to own a new studio. Malm Dep. 338, 679-81; Reznor Dep. at 151; Malm Aff. ¶ 18. Malm says he and Reznor agreed that Malm would defer collecting the remaining payments, with Reznor to pay him the balance later. Malm Dep. at 773-78. Malm also says he continued to defer commissions for the next few years, with the total reaching $2.2 million by the end of 1999. See Summary of Unpaid Commissions & Expenses ("Commission Summary"), attached to Defs.' Rule 56.1 Counter-Statement as Exhibit 5.[6] Reznor says that, while he understood Malm's position that Reznor owed him considerably more money than Malm had been paid so far, Reznor did not agree that Reznor himself was entitled to nothing after two years of touring, although he admits he never expressed these misgivings to Malm. Reznor Dep. at 154. Reznor also says there was no discussion, let alone agreement, that he would ever "repay" Malm any money. Reznor Dep. at 152.

Reznor and Malm later created three other companies in which each owned 50 percent: Nothing Interactive, Inc. ("NI"), on March 23, 1995; Nothing Records Limited, Inc. ("NRLI"), on January 21, 1997; and Halo Holding, on April 4, 1998. Malm Aff. ¶¶ 17-18. Malm had check-signing authority for each company. Malm Dep. at 307-08. It is unclear whether Reznor also had such authority, but it appears

---

[6]According to Malm's accounting, about $600,000 of the shortfall was owed him even before the 1994-95 tour, while about $1.4 million came due in 1995 as a result of the tour and another $200,000 came due in 1999.

undisputed that he never attempted to exercise such authority.  <u>See</u>, <u>e.g.</u>, Malm Dep. at 308.

On January 12, 1996, Malm hired Richard Szekelyi to provide financial consulting services to JAM and to the jointly owned companies.  Affidavit of Richard Szekelyi, sworn to 6/30/04, ¶ 6; Engagement Letter, 1/12/96, attached to Affirmation of Michael F. Lynch, 11/19/04, ("Lynch Aff.") as Exhibit I.  While Reznor says Malm told him to consult Szekelyi if he had any financial issues, Reznor Dep. at 56, Szekelyi says he never provided services to Reznor personally.  Szekelyi Dep. at 16.  However, his duties included examining Reznor's personal financial records, as well as those of companies wholly owned by Reznor, <u>see</u>, <u>e.g.</u>, 1996 Personal Financial Statement of Michael T. Reznor, attached to Lynch Aff. as Exhibit L. Szekelyi quickly discovered that the accounting between the various entities was severely flawed.  For example, the depreciation of expensive recording equipment paid for by Reznor was carried on the books of Hot Snakes, which was now jointly owned, resulting in Malm receiving much of the tax benefit that should have gone solely to Reznor.[7]  Szekelyi Dep. at 521-24.

Around 1998, Interscope stopped funding NRI.  Malm Aff. ¶ 24. To keep the jointly owned companies operating, Malm and Szekelyi

_____

[7]The parties have not indicated what actions Szekelyi or Malm took when they discovered this error or when, if ever, Reznor was informed of it.  In his Rule 56.1 Statement, Reznor asserts that the mistake "was never rectified," <u>see</u> Plaintiff's Response to Statement of Undisputed Material Facts Submitted by Szekelyi and Navigent Group ¶ 33, but in the cited deposition passages there is no discussion of what was done about the mistake.  <u>See</u> Szekelyi Dep. at 521-24.

began making transfers to them, booked as loans, from both JAM's funds and Reznor's funds.[8]  Id. 23.  Reznor maintains that, while he knew money was being loaned to these companies, he was unaware this money was being shifted from his personal accounts.  Reznor Dep. at 12-13, 208-09.  On February 23, 1999, Rosen informed Malm that he was concerned about the deficits the jointly owned companies were now running and that the use of personal funds might someday be interpreted "as a breach of fiduciary duty."  Rosen Letter of Feb. 23, 1999, attached to Shiffman Opp.-Malm Aff. as Exhibit 7.

From November 1999 to July 2000, Reznor and NIN again went on tour.  JAM asserted a claim to its commission of 20 percent on the gross income from the American leg of the tour.  Malm Aff. ¶ 22.  Rosen, who represented a holding company for tour proceeds that was owned by Reznor, see Rosen Dep. at 233, told Malm he believed JAM's commission was too high.  Id. at 234-35.  Malm responded that Reznor was "okay with it" and had other lawyers to look out for him.  Id. at 235-36.

Meanwhile, in the absence of funding from Interscope, the jointly owned companies NRI and NRLI increasingly focused on providing Reznor with personal services.  NRI became Reznor's personal bookkeeping operation, while NRLI served as Reznor's publicity company.  Malm Aff. ¶ 24.  On the other hand, Malm used the companies' office space for his own company and cannot remember how

---

[8]While Szekelyi vigorously maintains that his participation in these transfers was very limited, there is evidence in the record from which a fact-finder could infer active participation. See, e.g., Deposition of Dean Parker, 10/13/04, at 117-18.

much rent he paid.  Malm Dep. at 257.  In 2001, JAM stopped loaning

money to NRI and NRLI because, according to Malm, JAM had run out of

liquid assets.  Transfers continued to be made from the assets of

Reznor, who still had a significant amount of annual income.  Malm

Aff. ¶ 23.  By July 2002, Reznor had contributed about $1.47 million

more in loans to the joint companies than had JAM, a difference

reflected on Reznor's personal financial statement as money that JAM

owed him, although this sum was more than offset by the more than

$1.5 million that (according to a summary prepared by Szekelyi)

Reznor owed JAM in deferred commissions.  See NIN/Nothing Financial

Summary July 2002, attached to JAM Rule 56.1 Statement as Exhibit 20.

    That July, Malm, Szekelyi and Reznor met in New York.

Szekelyi presented Reznor and Malm with a detailed summary of

Reznor's finances, which Reznor and Malm signed and dated in

acknowledgment that they had reviewed and understood it.  Id.;

Szekelyi Dep. at 54.  This summary of Reznor's finances included a

line item indicating, without elaboration, that Reznor owed JAM $1.56

million in commissions.  At this time, the idea of shutting down NRI

and NRLI was discussed but rejected because doing so would have

complicated relations with Interscope, with which the joint companies

were in litigation.  Reznor Dep. at 89.  A similar meeting was held

in June 2003.  Malm Dep. at 470; Szekelyi Dep. at 61; 2003 Personal

Financial Statement, attached to JAM Rule 56.1 Statement as Exhibit

21.  By then, Reznor was owed almost $5.5 million by the joint

companies, and Szekelyi noted in the summary that no estimate had been made "of the realizable value of these advances."[9]  Id.

Around that time, Malm contacted Rosen about representing Reznor in connection with a new written management agreement between Malm and Reznor.  Rosen Decl. ¶ 8.  Rosen advised Malm that JAM would have to retain separate counsel, and JAM did so.  Id.  In November, Rosen received from Malm, for the first time, a copy of the 1989 Agreement.  Id. ¶ 9.  Not until that Fall did Rosen learn how much of Reznor's money had been loaned to the jointly owned companies.  Id.

In September 2003, having concluded that Malm had "run [his] finances into the ground," Reznor hired the firm Gelfand, Rennert & Feldman to manage his business affairs.  Reznor Dep. at 23-24, 408-11.  In December, Rosen telephoned Malm to inform him that Reznor had fired him as his manager.  The decision had been made two weeks earlier, based on what Reznor says were "discoveries" made by Gelfand Rennert.  Id. at 9.  Until that Fall, he says, he had been unaware of most of the details of his arrangement, including that Malm's 20 percent commission was paid out of gross revenues.  Id. at 24-25.  According to an analysis performed by Reznor's new managers, by the end of 2003 he had contributed more than $3.6 million in loans to the joint companies, compared with $640,000 contributed by Malm and his companies.  Harper Analysis, attached to Affirmation of Steven

---

[9]Both sides agree that the joint companies are at present effectively shells and that the money loaned to them is extremely unlikely ever to be repaid.

Shiffman in Opposition to Szekelyi and Navigent, 12/3/04, as Exhibit 9.

On April 21, 2004, Malm and JAM filed a lawsuit against Reznor in Ohio. On May 19, 2004, Reznor filed this suit. The two suits have been consolidated here, see Order, 8/20/04, with Malm's complaint refashioned as a counter-complaint.

Against this background, the Court turns to the summary judgment motions.

First, with regard to Reznor's claims against Malm and JAM (hereinafter, collectively "Malm"), for damages and rescission of the 1989 Agreement, based on breach of fiduciary duty, both sides seek summary judgment in their respective favor. These claims, the parties agree, are governed by New York law, pursuant to a choice of law provision in the 1989 Agreement.[10] Under New York law, a fiduciary relationship exists when one person "is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Mandelblatt v. Devon Stores, Inc., 132 A.D.2d 162, 168 (N.Y. App. Div. 1987), quoting Restatement (Second) of Torts § 874, cmt. a (1977).

Malm argues that his managerial relationship with Reznor was a "conventional business relationship" rather than a fiduciary one, see Reuben H. Donnelley Corp. v. Mark I Mktg. Corp., 893 F. Supp. 285, 289 (S.D.N.Y. 1995), and that he is therefore entitled to

_____

[10]The provision states that the "validity, interpretation and legal effect" of the contract shall be governed by New York law. 1989 Agreement ¶ 16(d).

summary judgment dismissing these claims. But a reasonable jury, construing the record most favorably to Reznor, could find that Malm's special position as trusted advisor to Reznor created a fiduciary duty to Reznor for any or all of the events in question, beginning even before the 1989 signing of the management agreement. See Gershunoff v. Panov, 77 A.D.2d 511, 512-13 (N.Y. App. Div. 1980) (finding fiduciary relationship created by manager-performer relationship). If such a relationship were created, Malm would be "bound by a standard of fairness, good faith and loyalty." Croce v. Kurnit, 565 F. Supp. 884, 892 (S.D.N.Y. 1982). A jury could find that Malm breached this duty by engaging in self-dealing, resulting in Reznor losing considerable amounts of money. Cf. Gershunoff, 77 A.D.2d at 512-13.[11]

Malm also argues that these claims are time-barred in whole or in part. Under New York law, a claim for damages based on breach of fiduciary duty has a three-year statute of limitations, see N.Y. C.P.L.R. § 214(4), while a parallel rescission claim, sounding in equity, has a six-year limitations period. See id. § 213(1). However, neither period begins until the plaintiff is on actual or inquiry notice of the relevant facts, see, e.g., Sferra v. Matthew, 103 F. Supp. 2d 617, 620-21 (E.D.N.Y. 2000), and there is sufficient evidence for a jury to conclude that Reznor himself was reasonably unaware of the relevant facts as late as 2003. Although Malm argues

[11]Malm argues that he (Malm) also lost money through the loans to the joint companies, but this simply means Reznor may not be able to collect disgorgement of profits, see Restatement § 874, cmt. b, not that damages are unavailable.

that Reznor's advisors, especially Rosen, had earlier knowledge that should be imputed to Reznor, numerous disputed questions remain as to the nature and scope of their agency that must be resolved before one can determine the effect of such imputed knowledge, if any. Likewise, whether Reznor had actual or imputed knowledge sufficient to estop him from asserting these claims is a genuinely disputed question for trial.

Similarly, the many material factual disputes that surround these claims of breach of fiduciary duty preclude summary judgment in Reznor's favor, just as they preclude it in Malm's favor. Reznor's relationship with Malm was still relatively informal at the time of the 1989 Agreement, and Malm had little more experience than Reznor in such dealings. A jury could find that Malm did not yet owe a fiduciary duty to Reznor, see Tyson v. Cayton, 784 F. Supp. 69, 76 (S.D.N.Y. 1992) (finding it question of fact for trial whether fiduciary duty existed prior to signing of first managerial agreement), or that under the circumstances Malm, who is not a lawyer and did not understand or request the inclusion in the agreement of many of the terms now at issue, fulfilled whatever duty he owed Reznor by disclosing all the material terms and facts of which he was aware. It is true that, by the time Malm began authorizing loans to the jointly owned companies and taking other actions on Reznor's behalf, his fiduciary obligations were clearer. However, there remains considerable dispute as to the extent to which Reznor was aware of and implicitly or explicitly consented to these actions. Moreover, Malm asserts that Reznor derived various personal benefits

from these expenditures of his funds, and so it remains disputed whether Malm's activities were improper and the extent to which Reznor was harmed by them.

Accordingly, both sides' motions for summary judgment are denied as to Reznor's claims against Malm and JAM of breach of fiduciary duty.

Second, Malm seeks summary judgment as to Reznor's claims against Malm (and JAM) alleging fraud after the signing of the 1989 Agreement. Under New York law (which also governs these claims), a fraud claim requires proof, by clear and convincing evidence, of "(1) a material misrepresentation or omission of facts, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff." Schlaifer Nance & Co. v. Estate of Warhol, 194 F.3d 323, 336 (2d Cir. 1999) (citation omitted). Here, a jury, taking the evidence most favorably to Reznor, could readily find that Malm intentionally misled Reznor about various transactions, knowing full well that Reznor would reasonably rely on his representations. To give just one example, a jury could find that Malm fraudulently led Reznor to believe that Reznor would have full ownership of the NIN trademarks and of the merchandising company. While Malm also argues that these claims are barred by the statute of limitations -- which bars fraud claims not brought within six years from the commission of the fraud or two years from the time the plaintiff discovered the fraud or, with reasonable diligence, should have done so, Shannon v. Gordon, 249 A.D.2d 291, 292 (N.Y. App. Div. 1998) --

as already stated, when Reznor knew or should have known of the alleged fraud is a genuinely disputed question of fact that the jury must resolve. Accordingly, summary judgment is denied as to Reznor's fraud claims against Malm and JAM.

Third, Malm seeks summary judgment on Reznor's claim that the 1989 agreement, its 1994 continuation, and various other agreements were fraudulently induced and should be rescinded. Although rescission is "an extraordinary remedy," it is available where plaintiff can prove fraud in the inducement. Mina Investment Holdings Ltd. v. Lefkowitz, 16 F. Supp. 2d 355, 362 (S.D.N.Y. 1998). A jury could find that Malm made material misstatements of fact in the making of these agreements, including representing to Reznor that Toorock was protecting his legal interests.[12] Accordingly, the fraudulent inducement claim also survives summary judgment.

_____

[12]Although Malm argues that Ohio law applies to this claim, which sounds in tort and therefore is not necessarily governed by the law chosen by the contract, see Krock v. Lipsay, 97 F.3d 640, 646 (2d Cir. 1996), he has not provided the sort of briefing that would help the Court resolve this choice-of-law question. The starting point must be whether, under the choice-of-law doctrine of the state (Ohio) whose law otherwise would apply, the contractual provision at issue governs a claim of fraud arising out of the contract's formation. See id. (applying New York choice-of-law law and determining that contract, which was made in New York but chose Massachusetts law, did not preclude application of New York law to fraud claim); Turtur v. Rothschild Registry Int'l, Inc., 26 F.3d 304, 309-10 (2d Cir. 1994) (determining that Texas law permits contract made in Texas to bind parties to application of New York law in tort claims arising out of contract). Because neither side has cited any relevant cases, and because application of Ohio law would not in any event affect the outcome of this motion, the Court for now does not reach the question of which law applies but urges the parties to provide the Court with relevant briefing in the schedule set for motions in limine prior to trial.

Fourth, Malm seeks summary judgment on Reznor's claim that various agreements, most notably the 1989 Agreement, were unconscionable and should be rescinded. In New York, unconscionability is a matter of law for a court to decide, not a jury question. See Estate of Louis T. Arena v. Abbot & Cobb, Inc., 158 A.D.2d 926, 926 (N.Y. App. Div. 1990). While, under some circumstances, it is appropriate for a court to hold an evidentiary hearing on the issue, the court is not required to do so where no reasonable doubt as to the validity of a contractual provision has been raised by the claimant's submissions. See, e.g., Am. Tel. & Tel. Co. v. N.Y.C. Human Resources Admin., 833 F. Supp. 962, 989 (S.D.N.Y. 1993).

At a minimum, an unconscionability claim requires proof that a contract "was both procedurally and substantively unconscionable when made -- i.e., some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." Gillman v. Chase Manhattan Bank, 73 N.Y.2d 1, 10 (1988) (internal quotations and citations omitted). In assessing procedural unconscionability, "the focus is on such matters as the size and commercial setting of the transaction..., whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was disparity in bargaining power." Id. at 11. As suggested by the inclusion of factors such as "the size and commercial setting of the transaction," the archetypal application of this doctrine is to a

"contract of adhesion" between a business and a consumer or between a business and an employee, see Am. Tel. & Tel. Co. v. N.Y.C. Human Resources Admin., 833 F. Supp. 962, 989 (S.D.N.Y. 1993) (rejecting unconscionability claim where "the contract at issue... is not the type of contract entered into by an unwary consumer"); see also Todd D. Rakoff, Contracts of Adhesion:  An Essay in Reconstruction, 96 Harv. L. Rev. 1173, 1283-84 (1983) (justifying greater judicial scrutiny in cases involving a company and an individual consumer). Indeed, courts "have rarely found a clause to be unconscionable" in contracts involving two commercial entities, a situation in which negotiation is presumed possible.  See Am. Dredging Co. v. Plaza Petroleum, 799 F. Supp. 1335, 1339 (E.D.N.Y. 1992).

There is no allegation here that Reznor lacked bargaining power relative to Malm or that Malm pressured him into signing any deal.  See Rowe v. Great Atl. & Pac. Tea Co., 46 N.Y.2d 62, 68 (1978) (unconscionability doctrine is meant to deal with situations where there is "a significant disparity in bargaining power").  Instead, Reznor argues that Malm, taking advantage of the trust Reznor placed in him, fraudulently induced him into entering the contract without scrutinizing its contents by making material misrepresentations as to its terms, failed to make full disclosures as to the import of various contractual provisions despite an obligation to do so, and misled him into believing that Malm and Toorock were protecting his interests when they were not.  These are arguments for claims of fraud and breach of fiduciary duty, not for a claim of unconscionability.  For one party, by exercise of power or pressure,

to extract the other party's consent to a one-sided contract may render the contract unconscionable; but for one party to dupe another party into entering into a one-sided contract is fraud.

In addition, Reznor has provided no evidence of substantive unconscionability. He simply asserts in conclusory fashion that the management agreement is "unfair on its face" and that every term favors Malm. However, the test for substantive unconscionability is not simply that a deal favors one party over the other, but that it is so "unreasonably favorable," <u>Gillman</u>, 73 N.Y.2d at 12, as to constitute a "transgression of a strong public policy" that overcomes the ordinary presumption that "the parties to a contract are basically free to make whatever agreement they wish, no matter how unwise it might appear to a third party." <u>Rowe</u>, 46 N.Y.2d at 68. While it is possible that Reznor could have commanded more favorable terms had he driven a tougher bargain, there is no admissible evidence that the objected-to provisions in the management agreement were unusual for the industry, let alone that they violated any public policy. Indeed, all indications are that Toorock provided a contract in which most provisions were standard. On the basis of this record, no reasonable court could find these provisions unconscionable as a matter of law.

It is Reznor's burden to "overcome the presumption of conscionability," <u>Estate of Louis T. Arena v. Abbot & Cobb</u>, Inc., 158

A.D.2d 926, 926 (N.Y. App. Div. 1990), and he has not done so.

Accordingly, Reznor's unconscionability claim is dismissed.[13]

Fifth, Malm moves for summary judgment on Reznor's breach of contract claims against Malm (and JAM), to the extent they allege breaches before May 19, 1998. The Court agrees that any such claims are time-barred. Under New York law, breach of contract claims must be brought within six years of the alleged breach, regardless of whether plaintiff was aware at the time of the breach that he had a cause of action. Ely-Cruikshank Co. v. Bank of Montreal, 81 N.Y.2d 399, 403 (1993). Here, Reznor claims that Malm breached contractual requirements to "confer with, counsel and advise" him on all matters pertaining to his career, including compensation other artists were earning; but he fails to allege when these breaches occurred. Summary judgment is therefore granted dismissing any claim for any such breaches that occurred before May 19, 1998.

Sixth, Reznor seeks summary judgment on Malm's counterclaims, under breach of contract and conversion theories, for unpaid commissions and expenses from the 1994-95 tour and earlier. Here, again, the problem is one of statute of limitations. The 1989 Agreement (either alone or as extended) entitled Malm to payments immediately upon Reznor's receipt of Reznor's own compensation. By Malm's own sworn account, he told Reznor almost immediately after the 1995 tour that Reznor owed him money but that he would take no action to collect it. A statute of limitations period would be meaningless

---

[13]The Court does not reach Malm's alternative argument that the unconscionability claim is time-barred.

if a party's intentional forbearance from demanding payment could nullify it. While Reznor was perhaps not in breach until a reasonable period of time to make his payments had passed, no juror could find that Reznor was in breach later than April 21, 1998, six years before Malm filed his suit in Ohio.

As for the alleged oral agreement between Reznor and Malm to defer payments, a signed writing is necessary to stop the limitations clock on a breach of contract claim, see N.Y. Gen. Obl. L. § 17-101. In attempt to satisfy the signed writing requirement, Malm points to the 2002 financial summary, which Reznor signed to indicate he had read and understood it. But nowhere does Reznor indicate agreement that he owed the sums indicated, much less an intention to revive any stale claims to that money. See Nat'l Westminster Bank USA v. Petito, 608 N.Y.S.2d 427, 428 (N.Y. App. Div. 1994) (requirement is signed document containing "plain admission that the debt is due and the party is willing to pay it").

Malm also argues that Reznor made partial payments on his debt in 1999. It is true, of course, that a statute of limitations period can be renewed by partial payment of principal or interest that implies "a promise to pay the remainder of the debt," see Skaneateles Savs. Bank v. Modi Assocs., 239 A.D.2d 40, 43 (N.Y. App. Div. 1998); but here there is insufficient evidence in the record to support any such assertion. Malm points to a summary of paid and unpaid commissions prepared by Szekelyi that shows that in 1999, when Reznor received a $1.67 million recording advance (the first time he had made more than $250,000 since the 1994-95 tour) and thereby owed

Malm $334,000, he made a $100,000 payment.  See Commission Summary.
But there is no indication that this payment was made against
deferred prior debt; the only reasonable inference, without any other
evidence in the record, is that it was Malm's commission for Reznor's
substantial income that year.  Moreover, even had the payment been
clearly accounted for as a partial payment on past-due commissions,
it would not be evidence of Reznor's intent to honor the remaining
debt, since there is no indication that Reznor authorized or even was
aware of this payment.

     Accordingly, summary judgment is granted to Reznor as to
Malm's breach of contract and conversion claims claiming unpaid
commissions from 1995 and earlier.[14]

     Seventh, Malm seeks summary judgment on Reznor's negligence
claim against Malm to the extent that it alleges damages that accrued
before May 19, 2001.  In his negligence claim, Reznor alleges that
Malm failed to exercise the degree of skill reasonably expected of a
business manager in supervising NIN's tours and ensuring their
profitability.  In particular, he alleges that Malm failed to
properly advise Reznor that how profitable the tours were would have
no impact on Malm's commissions, which were based on the gross
proceeds.  However, the statute of limitations for negligence is
three years, N.Y. C.P.L.R. § 214(4), meaning that Reznor is barred

_____

     [14]Malm's summary of commissions owed and paid suggests he
should have been paid $334,000 in 1999 but only was paid
$100,000.  Although it is unclear whether he is asserting a claim
to this difference, if he is it is within the six-year
limitations period and survives summary judgment.

from bringing a cause of action that accrued more than three years

before he brought this suit, on May 19, 2004.[15]  This cause of action

accrues when the acts or omissions constituting the negligence

produce the injury.  Triangle Underwriters, Inc. v. Honeywell

Information Systems, Inc., 604 F.2d 737, 744 (2d Cir. 1979).

Reznor's most recent tour ended in the summer of 2000.  Accordingly,

any cause of action under this theory related to the tours is time-

barred.[16]

     Eighth, Malm seeks summary judgment on Reznor's claim for

conversion.  Conversion is "the unauthorized assumption and exercise

_____

     [15]Reznor cites the doctrine of continuous representation,
which tolls the statute of limitations where defendant
continuously rendered professional services to the plaintiff in
connection with the transactions that are the subject of the
plaintiff's complaint.  However, this doctrine only applies to
malpractice claims against professionals, such as doctors,
attorneys or accountants, see Castle Oil Corp. v. Thompson
Pension Employee Plans, 299 A.D.2d 513, 514 (App. Div. 2002), who
in return are subject to a special three-year limitations period
for all claims.  N.Y. C.P.L.R. § 214(6).  Treatment as a
"professional" for these purposes requires qualities such as
"extensive formal learning and training, licensure and regulation
indicating a qualification to practice, a code of conduct
imposing standards beyond those accepted in the marketplace and a
system of discipline for violation of those standards."  Chase
Scientific Research v. NIA Group, 96 N.Y.2d 20, 29 (2001).
Courts consistently have rejected extension of the continuous
representation doctrine to occupations that do not fit easily
into this narrow definition of a professional.  See, e.g., Castle
Oil, 299 A.D.2d at 514-15 (actuaries not professionals); Matthews
and Fields Lumber Co., Inc. v. New England Ins. Co., 113 F. Supp.
2d 574, 578-79 (W.D.N.Y. 2001) (insurance companies and brokers
not professionals).  Malm is not a professional for these
purposes, and so the continuous representation doctrine does not
apply.

     [16]Reznor asserts, without elaboration, that Malm is also
negligent based on more recent events.  To the limited extent
that Reznor can show that Malm's negligence produced injury after
May 19, 2001, this claim survives summary judgment.

of the right of ownership over goods belonging to another to the exclusion of the owner's rights." <u>Wechsler v. Hunt Health Sys.</u>, 330 F. Supp. 2d 383, 431 (S.D.N.Y. 2004) (citation omitted).  Plaintiff must show that (1) plaintiff had a legal ownership interest in the property, and (2) defendant "exercised unauthorized interference with the plaintiff's ownership or possession of that property." <u>Id.</u>  On the instant record, a jury could reasonably find that Malm converted assets belonging to Reznor by transferring Reznor's money to the jointly held companies without authorization.  Malm argues that no money was transferred to him, and so he received no benefit from the transfers.  However, the tort of conversion does not require that the defendant benefit from his interference with the plaintiff's ownership interest.  Summary judgment is therefore denied as to this count.

 <u>Ninth</u>, co-defendants Szekelyi and Navigent Group (hereinafter, collectively "Szekelyi") seek summary judgment on Reznor's claims against them of negligence, breach of fiduciary duty, and malpractice.  There is little distinction between these claims, all of which allege that Szekelyi did not meet the standards of the accounting profession in the performance of professional duties to Reznor.  <u>See</u> <u>Sec. Investor Prot. Corp. v. BDO Seidman, LLP</u>, 49 F. Supp. 2d 644, 654 (S.D.N.Y. 1999).

Since Reznor was not Szekelyi's client,[17] Szekelyi would be liable to Reznor for malpractice only where he was aware that the nonclient would rely on his work for a particular purpose, see Credit Alliance Corp. v. Arthur Anderson & Co., 65 N.Y.2d 536, 551 (1985); Ambassador Factors v. Kandel & Co., 215 A.D.2d 305, 306-07 (N.Y. App. Div. 1995). Szekelyi's presentations to Reznor in 2002 and 2003 meet this standard, and so Szekelyi is liable for any malpractice he may have committed in preparing and presenting these reports of Reznor's financial status. However, there is no evidence that Szekelyi breached any standard of care in preparing and presenting these reports. Reznor does not allege any inaccuracies in these reports;[18] rather, after establishing that Szekelyi owed a duty of care with respect to these reports, he argues that Szekelyi failed to counsel

---

[17]Reznor argues that he and the attorney Ross Rosen understood Szekelyi to be his business manager, and that this creates an issue of triable fact. However, to the extent that someone other than Szekelyi (most notably Malm) led them to believe this, this "evidence" is inadmissible hearsay against Szekelyi, and there is no indication that they had any other grounds on which to form this belief. Reznor also argues that the fact that Szekelyi's duties included reviewing Reznor's finances and the records of Reznor's wholly-owned companies made Szekelyi his accountant. But there is no evidence in the record before this Court that Szekelyi performed any of these services on Reznor's behalf or at Reznor's direction.

[18]Reznor does argue that there were inaccuracies in a report Szekelyi performed regarding Reznor's finances in 1996, specifically that this report did not state that Reznor was loaning more money to the jointly held companies than was Malm and that the report listed those loans as "fully collectible." However, there is no evidence that, as of that time, Reznor *was* loaning more money than Malm. Nor is there evidence that Szekelyi's statement that the loans were fully collectible constituted wrongdoing at that time, when the companies still were being funded by Interscope.

Reznor adequately concerning certain other transactions.  Because
Szekelyi was not Reznor's accountant or business manager, he owed
Reznor in his individual capacity no such duty with respect to other
transactions.[19]

Tenth, Szekelyi (and Navigent) also move for summary judgment
with respect to Reznor's claims against them alleging fraud and
aiding and abetting fraud.  An accountant can be liable to a
nonclient for fraud if he has knowledge of the falsity of his
client's statements or acts in reckless disregard of such falsity
where the circumstances should cast doubt on the information's
veracity and where the accountant is aware of the plaintiff's
reasonable reliance on him.  See Houbigant, 303 A.D.2d at 99-100.
Here, Reznor alleges that Szekelyi assisted Malm in secretly and
illegally diverting Reznor's money into the jointly held companies.
However, there is no evidence that, even if Malm were defrauding
Reznor by misleading him as to which accounts the loans were coming
from, Szekelyi knew or should have known of any impropriety.[20]

---

[19]Reznor claims that Szekelyi had a conflict of interest when
simultaneously working for JAM and the jointly held companies.
However, he does not attempt to recover on behalf of the jointly
held companies, to which Szekelyi arguably did owe a duty of
care.  These allegations are therefore irrelevant.

[20]Reznor implies that various financial arrangements,
including the joint ownership of the merchandising company and
the transfer of money from Reznor's personal accounts to the
joint companies, were so facially suspect that Szekelyi should
have been on notice that Reznor did not consent to them.  But
Reznor has submitted no evidence to back up this proposition,
such as an affidavit from another accountant.  Cf. Ris v. Finkle,
148 Misc. 2d 773, 777-78 (N.Y. Sup. Ct. 1989) (granting summary
judgment where plaintiff failed to produce expert testimony as to
what accountant's standard of care was).  Indeed, the record does

Indeed, there is no evidence that Szekelyi did anything but attempt to correct the only clearly flawed accounting in evidence, _i.e._, the improper tax treatment of the Hot Snakes recording equipment. Accordingly, summary judgment must be granted on the fraud claims, which also means that, given the above-described grant of summary judgment on the other claims against Szekelyi and Navigent,[21] summary judgment is granted as to _all_ counts against Szekelyi and Navigent Group.

In sum: Malm's motion for summary judgment is granted with respect to (a) Reznor's unconscionability claims, (b) Reznor's breach of contract claims to the extent that they allege breaches before May 19, 1998, and (c) Reznor's negligence claims that accrued before May 19, 2001; and is otherwise denied. Reznor's motion for summary judgment is granted with respect to Malm's counterclaims for breach of contract and conversion arising out of commissions allegedly owed prior to April 21, 1998; and is otherwise denied. The motion of co-defendants Szekelyi and Navigent Group for summary judgment is granted in full, and they are dismissed from the case, with prejudice. The remaining claims will proceed to trial, as scheduled, beginning at 9 a.m. on May 16, 2005.

SO ORDERED.

---

not even contain the various records that Szekelyi would have seen or an accounting of the transactions that took place. On this record, a jury could do no more than speculate wildly about what any accountant should have known or should have done.

[21]The Court does not reach the argument that all claims against Szekelyi and Navigent Group are also barred by various statutes of limitations.

JED S. RAKOFF, U.S.D.J.

Dated:  New York, New York
        April 22, 2005